1999 UT App 227

**Alan TRUJILLO and Sharon Trujillo, Plaintiffs and Appellants,**

v.

**UTAH DEPARTMENT OF TRANSPORTATION; Ball, Ball & Brosamer, Inc., a California corporation; and John Does I through X, Defendants and Appellees.**

No. 981331–CA.

Court of Appeals of Utah.

July 22, 1999.

---

Gary B. Ferguson, Williams& Hunt, Salt Lake City, for Appellants.

Mark J. Williams, Plant, Wallace, Christensen & Kanell and Stephen P. Horvat, Anderson & Karrenberg, Salt Lake City, for Appellee Utah Department of Transportation.

Stephen G. Morgan and Joseph E. Minnock, Morgan, Meyer and Rice, Salt Lake City, for Appellee Ball, Ball & Brosamer.

Before BILLINGS, JACKSON, and ORME, JJ.

## OPINION

ORME, Judge:

¶ 1 Alan and Sharon Trujillo appeal the trial court's grant of summary judgment in favor of defendants Utah Department of Transportation (UDOT) and Ball, Ball and Brosamer, Inc. (Ball). The Trujillos were injured in a traffic accident on a stretch of I–84 then under construction. The Trujillos challenge the trial court's rulings that the "discretionary function" variant of governmental immunity shields UDOT from liability and that the general contractor, Ball, is not liable to the Trujillos because it followed plans and specifications that were not unreasonably dangerous. The Trujillos' points are well-taken, and we reverse.

## BACKGROUND

¶ 2 Because they appeal from summary judgment against them, we state the facts in the light most favorable to the Trujillos. *See Ledfors v. Emery County Sch. Dist.*, 849 P.2d 1162, 1162 (Utah 1993).

¶ 3 On September 24, 1995, the Trujillos were driving eastbound on a winding, two-lane stretch of I–84 through Weber Canyon when a westbound pick-up truck veered into their lane and collided head-on with their motor home. The Trujillos suffered serious permanent injuries from the accident, and the driver of the pick-up died at the scene.

¶ 4 I–84 is normally a four-lane, divided highway. However, at the time of the accident, the two eastbound lanes on the stretch of road where the accident occurred were closed for road resurfacing. Consequently, both directions of traffic had been channeled onto the two previously westbound lanes. Diversion of both directions of traffic onto two contiguous lanes is known as two-lane, two-way operations (TLTWO). The two lanes of the TLTWO were each ten to twelve feet wide with only two feet between them. Double yellow lines painted on the road surface and hollow plastic barrels spaced at 100–foot intervals divided the traffic flowing in opposite directions.

¶ 5 Traffic in the construction zone had been redirected pursuant to a traffic control plan designed by UDOT and implemented by

Ball. Plans for the entire I–84 project were drafted, formulated, and approved in a series of meetings and reviews over the course of approximately one year. Participants included Federal Highway Administration representatives; UDOT maintenance, engineering, design, and administrative personnel; and several city and county officials. However, although deposition testimony indicates that two UDOT engineers discussed the traffic control plan's separation of the two lanes, the record contains no evidence that the traffic control plan was ever specifically singled out for discussion, review, or approval at any point in the approval process.

¶ 6 As general contractor, Ball was contractually responsible for supervision of traffic control in the construction zone. Ball's contract with UDOT also required it to propose an alternate traffic control plan if it found UDOT's plan to be unsafe or inadequate. Shortly after construction on the project began and four months before the Trujillos' accident, Ball's project manager, Shankar Narayanan, wrote to Larry Durrant, UDOT's project engineer, expressing his concern that UDOT's traffic control plan was inadequate. The letter stated in part:

> This letter is to reiterate our concerns with regard to UDOT's less than adequate traffic control design for this project. In particular we feel that the use of drums at 100' spacing to delineate opposing traffic in an Interstate highway is hazardous to the travelling public resulting in increasing the chances of accidents.

¶ 7 Five days later, Durrant answered the letter, stating that "[i]f [Ball] feels UDOT's traffic control plans are inadequate, then as outlined [in the contract], the traffic control supervisor's responsibility is to prepare and submit revisions to the traffic control plans for the subject project." Narayanan testified in his deposition that he and Durrant discussed possible options for addressing his concerns, including the use of concrete barriers. However, it is undisputed that no aspect of the traffic control plan was altered.

¶ 8 About one year after the September 1995 accident, the Trujillos filed suit against UDOT and Ball in Third District Court. The Trujillos alleged that UDOT and Ball were negligent in the design, supervision, and implementation of the traffic control plan for the I–84 resurfacing project. Specifically, the Trujillos alleged that UDOT and Ball negligently failed to install concrete barriers to prevent crossover accidents in the area where the Trujillos' accident took place.

¶ 9 UDOT and Ball moved for summary judgment, arguing they owed no duty of care to protect the Trujillos from crossover accidents. UDOT also argued that governmental immunity shielded it from tort liability. The trial court granted summary judgment in favor of both defendants, reasoning that "the decision made by UDOT in planning and designing the I–84 resurfacing project, which included a Traffic Control Plan utilizing barrels to separate [traffic in the TLTWO] was a discretionary act which created immunity for UDOT under the discretionary function exception to the Governmental Immunity Act." The court further ruled that "in carrying out the plans and specifications for I–84 drafted by UDOT, [Ball] acted in accordance with the plans and specifications, which were not so unreasonably dangerous that a reasonable contractor would not perform and carry out said plans and specifications."

¶ 10 The Trujillos timely appealed to the Utah Supreme Court, which transferred the matter to this court as permitted by Utah Code Ann. § 78–2a–3(2)(j) (1996).

## ISSUES AND STANDARDS OF REVIEW

¶ 11 The Trujillos raise two issues on appeal. First, the Trujillos argue the trial court erred when it concluded that governmental immunity shields UDOT from liability for alleged negligence in planning and designing the I–84 resurfacing project, including formulating the traffic control plan, and in ruling that design of the project was a discretionary function under a provision of the Utah Governmental Immunity Act, Utah Code Ann. § 63–30–10(1) (1997).[1] Second,

1. As a convenience to the reader, and because the provisions in effect at the relevant times do not differ materially from the statutory provisions currently in effect, we cite to the most recent statutory codifications throughout this opinion, unless otherwise noted.

the Trujillos challenge the trial court's conclusions that, as a matter of law, the traffic control plan designed by UDOT was not unreasonably dangerous and that Ball was therefore not negligent in implementing it.

■ ¶ 12 "Summary judgment is proper only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Taylor v. Ogden Sch. Dist.*, 927 P.2d 159, 162 (Utah 1996). We review the trial court's conclusion that the parties raised no genuine issues of material fact, and its application of the governing law, for correctness. *See Nelson v. Salt Lake City*, 919 P.2d 568, 571 (Utah 1996). As we analyze the issues, we are mindful that, "because negligence cases often require the drawing of inferences from the facts, which is properly done by juries rather than judges, 'summary judgment is appropriate in negligence cases only in the clearest instances.'" *Id.* (quoting *Dwiggins v. Morgan Jewelers*, 811 P.2d 182, 183 (Utah 1991)).

## DISCRETIONARY FUNCTION IMMUNITY

■ ¶ 13 Sovereign immunity, rooted in the medieval British notion that the King could do no wrong, precludes lawsuits against governmental entities without the government's consent. *See Brittain v. State*, 882 P.2d 666, 668–69 (Utah Ct.App.1994).

### A. Statutory Immunity Scheme

¶ 14 In 1965, the Utah Legislature passed the Governmental Immunity Act, codifying the sovereign immunity doctrine in Utah. *See DeBry v. Noble*, 889 P.2d 428, 432 (Utah 1995) (citing 1965 Utah Laws 390, ch. 139, § 3). The Act first grants general immunity from suit to governmental entities, then narrows that general grant by waiving immunity for certain claims, and finally broadens immunity again with exceptions to the waivers that result in retaining immunity under certain circumstances. *See Hansen v. Salt Lake County*, 794 P.2d 838, 842 (Utah 1990).

¶ 15 Section 63–30–3(1) of the Act confers the general grant of immunity: "Except as may be otherwise provided in this chapter, all governmental entities are immune from suit for any injury which results from the exercise of a governmental function[.]" Utah Code Ann. § 63–30–3(1) (1997). "Governmental function" is broadly defined as "any act, failure to act, operation, function, or undertaking of a governmental entity." *Id.* § 63–30–2(4)(a) (1997). *Cf. Keegan v. State*, 896 P.2d 618, 620 (Utah 1995) ("[T]he test for determining whether the activity undertaken is a governmental function focuses on whether that activity 'is of such a unique nature that it can only be performed by a governmental agency or that it is essential to the core of governmental activity.'") (quoting *Standiford v. Salt Lake City Corp.*, 605 P.2d 1230, 1236–37 (Utah 1980)).

¶ 16 Scattered sections of the Act waive immunity under particular circumstances. Thus, the Act permits claims against governmental entities that involve contract obligations, *see* Utah Code Ann. § 63–30–5 (1997); property, *see id.* §§ 63–30–6, –10.5; defective public buildings and improvements, *see id.* § 63–30–9; and negligent acts and omissions of public employees. *See id.* § 63–30–10. The Act specifically waives immunity for injuries caused by dangerous or defective highways. *See id.* § 63–30–8. When immunity is waived, the "liability of the [governmental] entity [is] determined as if the entity were a private person." *Id.* § 63–30–4(1)(b).

¶ 17 For certain kinds of claims, however, such waivers of immunity are restricted by a number of exceptions. *See* Utah Code Ann. § 63–30–10 (1997). Thus, although the Act waives immunity for liability from injuries caused by defective conditions of public buildings and highways, and by the negligence of public employees, immunity is retained "if the injury ar[ose] out of, in connection with, or result[ed] from" one of nineteen enumerated circumstances. *Id.* For example, immunity is retained if an injury resulted from a failure to revoke a permit, *see id.* § 63–30–10(3), or make an inspection. *See id.* § 63–30–10(4). Immunity is also retained with respect to injuries caused by natural conditions on public land. *See id.* § 63–30–10(11). Of particular significance in this appeal, immunity is retained for injuries that arise out of "the exercise or performance or the failure to exercise or perform a discre-

tionary function, whether or not the discretion is abused." *Id.* § 63–30–10(1).

■ ¶ 18 To determine whether the trial court correctly ruled that the Governmental Immunity Act bars the Trujillos from proceeding with their negligence claims against UDOT, we follow the three-step analysis established by the Utah Supreme Court. *See Keegan,* 896 P.2d at 619–20; *Ledfors v. Emery County Sch. Dist.,* 849 P.2d 1162, 1164 (Utah 1993). Tracking the logic of the Act, the established analysis addresses three issues. Applied to the facts of this case, they are, first, whether the design of the traffic control plan for the I–84 resurfacing project was a governmental function to which section 63–30–3(1)'s general grant of immunity applies, *see Keegan,* 896 P.2d at 619–20; second, if the design of the traffic control plan is a governmental function, whether the Act waives immunity for injuries arising out of the particular governmental function at issue, *see id.;* and finally, even if immunity is otherwise waived, whether an exception applies that retains immunity for the exercise of that governmental function. *See id.*

¶ 19 The parties agree that UDOT's construction of I–84 is a governmental function and, thus, that the Governmental Immunity Act applies to the Trujillos' claims against UDOT. Likewise, the parties agree that "immunity from suit of all governmental entities is waived for any injury caused by a defective, unsafe, or dangerous condition of any highway." Utah Code Ann. § 63–30–8 (1997). Here, however, agreement between the parties ends. Their disagreement centers on the final prong of the three-part test: whether, even though section 63–30–8's waiver appears to permit the Trujillos to pursue their claims against UDOT for injuries they allege were caused by a defective, unsafe, or dangerous condition of I–84, an exception specified in the Act nevertheless bars the Trujillos' action. UDOT argues the trial court correctly concluded that the "discretionary function" exception does just that.

■ ¶ 20 Section 63–30–10 provides, in relevant part, as follows:

Immunity from suit of all governmental entities is waived for injury proximately caused by a negligent act or omission of an employee committed within the scope of employment except if the injury arises out of, in connection with, or results from:

(1) the exercise or performance or the failure to exercise or perform a discretionary function, whether or not the discretion is abused....

*Id.* § 63–30–10. Utah precedent interpreting and applying the discretionary function exception has articulated two policies served by the exception. First, the discretionary function exception " ' "shield[s] those governmental acts and decisions impacting on large numbers of people in a myriad of unforeseen ways from individual and class legal actions, the continual threat of which would make public administration all but impossible." ' " *Keegan,* 896 P.2d at 623 (citations omitted). Second, the exception preserves the autonomy of coordinate branches of government. To that end, " '[w]here the responsibility for basic policy decisions has been committed to one of the branches of our tri-partite system of government, the courts have refrained from sitting in judgment of the propriety of those decisions.' " *Id.* (quoting *Little v. Utah State Div. of Family Servs.,* 667 P.2d 49, 51 (Utah 1983)).

**B. Policy-making Versus Operations**

■ ¶ 21 Discretionary function immunity has been interpreted and applied in a manner consistent with the policies it was intended to promote. Thus, the Utah Supreme Court has recently stated that, in comparison to the ancient doctrine of sovereign immunity, discretionary function immunity is "a distinct, more limited form of immunity [that] should be applied only when a plaintiff is challenging a governmental decision that involves a basic policy-making function." *Nelson v. Salt Lake City,* 919 P.2d 568, 575 (Utah 1996). Not every governmental action involving discretion is a discretionary function within the meaning of the Act. *See Bigelow v. Ingersoll,* 618 P.2d 50, 53 (Utah 1980). Were it otherwise, the exception would swallow the rule, as almost all governmental decisions involve some discretion. *See Nelson,* 919 P.2d at 575; *Bigelow,* 618 P.2d at 53. Consequently, only those decisions arising out of a governmental entity's basic policy-

making function qualify for immunity under the discretionary function exception. *See Keegan,* 896 P.2d at 623.

¶ 22 "Although the term 'discretionary function' is not susceptible to precise definition in all legal contexts," *Nelson,* 919 P.2d at 575, case law interpreting discretionary function immunity has stated that " '[d]iscretionary acts are those "characterized by a high degree of discretion and judgment involved in weighing alternatives and making choices with respect to public policy and planning." ' " *Keegan,* 896 P.2d at 625 (citations omitted). Governmental decisions that are " ' "the result of serious and extensive policy evaluation, judgment, and expertise in numerous areas of concern" ' " qualify as immune discretionary functions. *Id.* (citations omitted).

¶ 23 In contrast to governmental decisions involving evaluation of broad policy factors, "acts and decisions at the operational level—those everyday, routine matters"—are not discretionary functions. *Nelson,* 919 P.2d at 575. Therefore, while the formulation of policy is an immune discretionary function, "the execution of already-formulated policies" is not. *Keegan,* 896 P.2d at 623. Allegations that a governmental entity has been negligent must be separately examined to determine if each act complained of is an immunized discretionary function or is merely an operational or ministerial implementation of already-established policy. *See Hansen,* 794 P.2d at 846; *Doe v. Arguelles,* 716 P.2d 279, 283 (Utah 1985). *See also Rocky Mountain Thrift Stores, Inc. v. Salt Lake City Corp.,* 784 P.2d 459, 463–64 (Utah 1989) (analyzing separately each allegation of negligence under exception retaining immunity for negligent failure to inspect or inadequate inspection).

¶ 24 Guided by these distinctions, prior case law has held, for example, that "[d]ecisions made by [Salt Lake City] regarding the design, capacity, and construction of their flood control systems" were immunized under the discretionary function exception because the decisions were "the result of serious and extensive policy evaluation, judgment, and expertise in numerous areas of concern[, including] geological, environmen-

tal, financial, and urban planning and developmental concerns, and financial concerns." *Rocky Mountain Thrift,* 784 P.2d at 463. Likewise, the Utah Supreme Court has held that the process by which UDOT determines when railroad crossing warnings will be upgraded is a discretionary function. *See Duncan v. Union Pac. R.R.,* 842 P.2d 832, 835 (Utah 1992). Finally, our Supreme Court recently held that it was an act of discretion for UDOT to decide not to replace a concrete barrier when, after two road surface overlays, it no longer reached the height required by safety standards. *See Keegan,* 896 P.2d at 619, 626. The Court held that "the determination of whether to raise the concrete median barrier was a decision inherently bound up in economic, political, and safety considerations, as indicated by [the UDOT safety engineer's] safety study report and [the UDOT project design engineer's] cost-benefits report." *Id.* at 625.

¶ 25 In contrast, the Court has ruled that the State was not immune from suit for injuries caused by an allegedly dangerous traffic control system because, "[a]lthough the acts of the State … in designing the traffic control system involve some degree of discretion, as do almost all acts, the design of the traffic control system does not involve the 'basic policy making level.' " *Bigelow,* 618 P.2d at 53. Similarly, in *Andrus v. State,* 541 P.2d 1117 (Utah 1975), our Supreme Court held that "[t]he decision to build [a] highway and specifying its general location were discretionary functions, but the preparing of plans and specifications and the supervision of the manner in which the work was carried out cannot be labeled discretionary functions." *Id.* at 1120. Thus, the Court held that the State enjoyed no immunity from suit for water damage to property allegedly arising out of the design and specifications for construction of a highway. *See id.*

¶ 26 Likewise, the Utah Supreme Court held in *Carroll v. State ex rel. Road Comm'n,* 27 Utah 2d 384, 496 P.2d 888 (1972), that "the decision of the road supervisor to use berms as the sole means of protection for the unwary traveler [proceeding onto a closed road] was not a basic policy decision essential

to the realization or accomplishment of some basic governmental policy, program, or objective," but was merely a determination made at the operational level. 496 P.2d at 891–92. *See also Nelson*, 919 P.2d at 575–76 (holding that failure of governmental entity to repair breach in fence through which child gained access to river was not immune discretionary function); *Arguelles*, 716 P.2d at 283 (holding that decision to return juvenile offender to community was immunized discretionary function, but alleged negligence in monitoring juvenile's treatment after release was not similarly immune); *Little v. Utah State Div. of Family Servs.*, 667 P.2d 49, 51–52 (Utah 1983) (holding that, even if decision to place high-need child in foster home was immune discretionary function, alleged failure of Family Services to evaluate foster home, supervise placement, and protect child from harm was actionable).

¶ 27 Immunity is an affirmative defense which the defendant bears the burden of proving. *See Nelson*, 919 P.2d at 574. If UDOT "posits immunity on ... an exercise of discretion, it must make a showing that a conscious balancing of risks and advantages took place." [2] *Little*, 667 P.2d at 51. Accordingly, to successfully bear its burden of proving immunity from suit for the Trujillos' injuries, UDOT must show that each act of alleged negligence qualifies as a discretionary function under the following four-part test:

"(1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authori-

---

2. We note that the United States Supreme Court, in interpreting a similar discretionary function exception in the Federal Tort Claims Act, has not required such a showing. *See United States v. Gaubert*, 499 U.S. 315, 325, 111 S.Ct. 1267, 1275, 113 L.Ed.2d 335 (1991) (holding that, under FTCA, "[d]iscretionary conduct is not confined to the policy or planning level," and "acts of agency employees in executing [a] program" are also discretionary). Of course, this analytic approach is not binding on our interpretation of the discretionary function exception in the Utah Governmental Immunity Act, and the analysis consistently employed by the Utah Supreme Court is to the contrary.

In *Carroll v. State ex rel. Road Commission*, 27 Utah 2d 384, 496 P.2d 888 (1972), one of the earliest Utah cases interpreting the discretionary function exception, our Supreme Court recognized that the discretionary function exception in Utah's Governmental Immunity Act was patterned after a similar provision in the Federal Tort Claims Act. *See* 27 Utah 2d at 388, 496 P.2d at 891. Later, in *Little v. Utah State Division of Family Services*, 667 P.2d 49 (Utah 1983), the Court cited federal case law in support of the policy-versus-operations distinction first announced in *Carroll*. *See Little*, 667 P.2d at 51 ("[T]he lines in federal cases have been consistently drawn between those functions ascribable to the policy making level and those to the operational level[.]") (citing *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955)). More recently, the United States Supreme Court, in *United States v. Gaubert*, referred to the policy-versus-operations distinction as a misinterpretation of its earlier cases. *See* 499 U.S. at 326, 111 S.Ct. at 1275 ("[T]he distinction in *Dalehite* was merely description of the level at which the challenged conduct occurred. There was no suggestion that decisions made at an operational level could not also be based on policy.").

We recognize that the *Keegan* court cited a Fourth Circuit case that followed *Gaubert*'s abrogation of the policy/operational distinction. *See Baum v. United States*, 986 F.2d 716 (4th Cir.1993). The *Keegan* court quoted *Baum* for the proposition that, "to determine whether a certain decision involved the exercise of a discretionary function, courts must 'look to the nature of the challenged decision in an objective, or general sense, and ask whether the decision is one which we would expect inherently to be grounded in considerations of policy.'" *Keegan*, 896 P.2d at 625 (quoting *Baum*, 986 F.2d at 721). However, because *Keegan* applied the *Little* test and relied on evidence that the decisions there at issue were in fact made on the policy level after careful study and deliberation, we do not consider *Keegan* to have appreciably detracted from the validity of the long-standing policy-versus-operational analysis, which requires evidence that "a conscious balancing of risks and advantages took place" regarding each allegedly negligent act. *Little*, 667 P.2d at 51.

ty and duty to do or make the challenged act, omission, or decision?"

*Keegan*, 896 P.2d at 624 (quoting *Little*, 667 P.2d at 51).

 ¶ 28 This is a fact-intensive inquiry that, by its very nature, is not particularly amenable to summary judgment. *See, e.g., Hansen*, 794 P.2d at 846 (reversing summary judgment of immunity and remanding for further factual development regarding whether decision was one of policy or operation); *Rocky Mountain Thrift Stores*, 784 P.2d at 464 (same). *But see Duncan*, 842 P.2d at 836 (affirming summary judgment for State on immunity grounds).

### C. Analysis of Trujillos' Claims

¶ 29 The Trujillos charge UDOT with five separate acts of negligence. The Trujillos allege UDOT negligently (1) designed and implemented an unsafe traffic control plan for the I–84 resurfacing project; (2) used hollow plastic barrels rather than concrete barriers to separate traffic in the construction zone; (3) failed to reduce the speed limit in the construction zone as directed by the traffic control plan; (4) failed to investigate other accidents that had occurred in the construction zone prior to the Trujillos' accident and to make appropriate adjustments in traffic control to reduce the risk of future accidents; and (5) failed to alter traffic control techniques in response to the concerns of Ball's project manager, Mr. Narayanan. While we believe UDOT's basic decision to undertake the I–84 resurfacing project necessarily would be considered an immune discretionary function, we hold, on the record before us, that the discretionary function exception does not immunize UDOT from the claims the Trujillos have raised.

 ¶ 30 We first consider the Trujillos' claim that UDOT negligently designed an inadequate traffic control plan for the I–84 resurfacing project. We hold that the record on appeal does not support the trial court's conclusion that the design of the traffic control plan and its preference for barrels over barriers was made at the immunized policy-making level. The evidence presented by UDOT falls short of the standards set forth in prior Utah Supreme Court precedent.

*Keegan* provides an illustrative contrast. In that case, our Supreme Court detailed the process by which UDOT decided not to replace a concrete barrier even though it knew planned surface overlays would reduce its height below required safety standards. The Supreme Court noted that, before the second surface overlay, a UDOT safety studies engineer "carried out a comprehensive study of accident rates" from which he created a safety study report. *Keegan*, 896 P.2d at 624. The report concluded that safety would not be adversely affected if the barrier were not replaced during the second overlay. *See id.* Also before the second resurfacing, a UDOT project design engineer prepared a cost-benefit report using information from the safety study report. *See id.* The cost-benefit report considered factors such as

> the cost of removing and replacing the barrier, the already-scheduled major resurfacing project for I–80 in five or six years, the added delays and inconvenience to users of the highway if the barrier were to be dug up and replaced, and the possibility that the job could not be completed inexpensively and with minimal disruption to traffic during the short construction season in the canyon.

*Id.* This study and report were conducted and compiled "by senior engineers and circulated throughout and debated within the department." *Id.* After parsing the particulars of the decision-making process, the Court concluded that "UDOT's decision involved just the sort of policy-driven weighing of costs and benefits that the discretionary function exception was meant to protect." *Id.*

¶ 31 In this appeal, on the other hand, it is undisputed that the traffic control plan was formulated by an unlicensed UDOT staff engineer—an employee who did not perform at the policy-making level. Further, while the record on appeal contains a general description of the multi-level approval process for plans and specifications pertaining to the I–84 resurfacing project, UDOT's evidence does no more than establish the traffic control plan *could* have been discussed in these meetings. UDOT does not point us to evidence that the traffic control plan and the

barrels-versus-barriers decision was in fact the subject of intense scrutiny and review. UDOT now characterizes the decision to use barrels as a "tough choice" between two traffic separation methods and draws our attention to the relative risks and benefits of barrels and barriers. However, UDOT's evidence shows these issues were addressed only in private discussions between the project design engineer who drafted the traffic control plan and UDOT's Region One Design Engineer. These facts are insufficient to bring the formulation of the traffic control plan within the scope of discretionary function immunity.

¶ 32 Similarly, the Trujillos presented evidence to the trial court that the Manual of Uniform Traffic Control Devices (MUTCD), adopted by UDOT, listed particular "industry standard" factors to be considered before implementing TLTWO, specifically to guard against head-on collisions. The Trujillos presented additional evidence that an Occupational Safety Report for the stretch of I–84 involved in the resurfacing project was available, and, if consulted by UDOT, would have shown that accidents in the construction zone clustered around the area where the Trujillos' accident took place. Nevertheless, while the Occupational Safety Report and evidence of traffic-volume reports appear in the record, UDOT presented no documentary or testimonial evidence that either the MUTCD factors, the Occupational Safety Report, or the traffic volume reports were discussed in the course of approving the traffic control plan.[3]

¶ 33 UDOT argues the Governmental Immunity Act does not require it to consult written studies or to prove that specific issues were addressed during the decision-making process. UDOT contends the holding of *Keegan* is that decisions regarding

highway median design and lane separation are inherently discretionary functions. We disagree. Utah cases interpreting the discretionary function exception, including *Keegan*, have focused on the *process* by which decisions of governmental entities are made. Under Utah precedent, we cannot assume UDOT's traffic control plan was the product of the exercise of policy-level discretion simply because it dealt with highway median design. UDOT proffered no evidence that the formulation of the traffic control plan and the decision to separate opposing lanes of traffic with hollow plastic barrels were " ' "the result of serious and extensive policy evaluation, judgment, and expertise in numerous areas of concern." ' " *Keegan*, 896 P.2d at 625 (citations omitted). On the record before us, therefore, we hold that UDOT's formulation of the traffic control plan and its decision to use barrels rather than barriers have not been shown to rise to the immunized policy-making level.

■■■ ¶ 34 We next consider the negligent acts UDOT allegedly committed after the traffic control plan was in effect in the construction zone. We hold that these remaining allegations of negligence involve operational decisions on the part of UDOT, which implemented or failed to implement pre-established policy. *See Nelson*, 919 P.2d at 575–76; *Keegan*, 896 P.2d at 623. Specifically, we hold that failure to reduce speed in the construction zone as called for in the plan, failure to investigate accidents, and failure to meaningfully consider corrective action in response to Mr. Narayanan's letter[4] all are "acts and decisions at the operational level—those every day, routine matters" that do not enjoy immunity under the discretionary function exception. *Nelson*, 919 P.2d at 575.

---

3. Whether due to the Occupational Safety Report or on some other basis, UDOT did see fit to require concrete barriers rather than plastic barrels to protect the construction crews working on the shoulder of the highway from traffic.

4. Mr. Durrant's letter responding to Mr. Narayanan's concern is perhaps more interesting for what it does not say than for what it does say. If indeed the traffic control plan had been the result of the kind of policy analysis the discretionary function exception contemplates, we might

expect Mr. Durrant to have responded that, as a matter of policy, UDOT had determined that the traffic control plan, as written, adequately balanced competing concerns, such as safety and cost, and, because it was the product of extensive policy evaluation, it could not casually be altered. This, however, was not the tenor of his reply. Instead, he merely invited Mr. Narayanan to propose an alternative plan if he were so concerned.

¶ 35 The acts and omissions of which the Trujillos complain are analogous to those addressed in *Doe v. Arguelles*, 716 P.2d 279, 283 (Utah 1985), in which the Utah Supreme Court ruled that the State did not enjoy immunity when a juvenile with a history of sexual violence assaulted a young girl while he was in a community placement while in State custody. *See id.* The Court recognized that the decision to place the juvenile offender in the community was an immune discretionary decision made by the superintendent of the Youth Detention Center. *See id.* The Court ruled, however, that the failure of the superintendent to ensure that the offender received proper therapy, which had been prescribed by the superintendent himself, was actionable because it concerned the manner in which the superintendent implemented policy and not the policy itself. *See id.*

¶ 36 The Trujillos presented unrebutted evidence that the speed limit in the construction zone remained at 65 miles per hour despite the fact that the traffic control plan called for the speed limit to be reduced to 50 m.p.h. The Trujillos presented additional evidence that although two crossover accidents had occurred in the construction zone before the Trujillos' accident, UDOT had not investigated or analyzed either of them even though the traffic control plan mandated that accidents in the construction zone be investigated and analyzed.

¶ 37 These alleged omissions occurred *after* the allegedly unsafe and inadequate traffic control plan was adopted. Therefore, to echo the Court's conclusion in *Doe v. Arguelles*, even if the formulation of the plan was an immune discretionary function, immunity would not extend so far as to protect UDOT from liability for negligently executing the plan.

### D. Conclusion

¶ 38 On the record before us, UDOT has not demonstrated that discretionary function

immunity shields it from liability. The Trujillos' evidence, both as to the formulation and execution of the traffic control plan, refutes UDOT's contention that the relevant decisions were made at the policy level rather than at the operational level.

### LIABILITY OF BALL

¶ 39 We now consider Ball's potential liability to the Trujillos. A contractor has a duty to "perform the work required by its contract ... with that degree of care ordinarily possessed and exercised by other contractors doing the same or similar work in [the same] locality." *Andrus v. State*, 541 P.2d 1117, 1121 (Utah 1975). However, a "contractor is not liable if [it] has merely carried out the plans, specifications and directions given [it], since in that case the responsibility is assumed by the employer, *at least when the plans are not so obviously dangerous that no reasonable [person] would follow them.*" *Leininger v. Stearns–Roger Mfg. Co.*, 17 Utah 2d 37, 41, 404 P.2d 33, 36 (1965) (emphasis added). It follows that Ball can be held liable for the Trujillos' damages if, as the Trujillos allege, it negligently performed its responsibilities under its contract with UDOT or if the traffic control plan was so dangerous that a reasonable person would have refused to follow it.

¶ 40 First, regarding their allegation that UDOT's traffic control plan was so unreasonably dangerous that Ball should have refused to implement it, the Trujillos presented expert testimony that the plan failed to comply with MUTCD.[5] Moreover, the Trujillos allege that the letter from Ball's project manager, Mr. Narayanan, to UDOT's Larry Durrant shows that Ball was aware that separating opposing traffic with hollow plastic barrels posed an unreasonable danger to travelers on I–84. In the letter, Mr. Narayanan first voiced a concern over the meth-

---

5. Ball makes much of the fact that no evidence directly states that the traffic control plan was unreasonably dangerous. We note, however, that no witness could properly give that opinion because it is an ultimate question to be determined by the jury. The absence of evidence specifically describing the plan as unreasonably dangerous is, therefore, inconsequential. *See Gaw v. State ex rel. Dep't of Transp.*, 798 P.2d 1130, 1137 & n. 10 (Utah Ct.App.1990) (in summary judgment context, expert witness affidavits must not contain merely conclusory statements), *cert. denied*, unpublished order of Utah Supreme Court (Jan. 11, 1991).

od of separation and then tried to disclaim liability, stating that Ball "will implement the traffic control as shown on the plans and specification[s], however we will not be in a position to accept liability on accidents due to the conditions mentioned above." Five days later, Mr. Durrant responded, informing Mr. Narayanan that "[i]f Ball ... feels UDOT's traffic control plans are inadequate, then as outlined [in the contract], the traffic control supervisor's responsibility is to prepare and submit revisions to the traffic control plans for the subject project." Although Mr. Narayanan testified that he and Mr. Durrant discussed and resolved his concerns, Mr. Durrant did not recall any such conversation, and the plan was never revised. Thus, we conclude the evidence presented by the Trujillos is sufficient to create a material question of fact about whether the traffic control plan was unreasonably dangerous and whether Ball negligently failed to propose safer alternatives, as required by its contract with UDOT.

¶ 41 The Trujillos further allege Ball was negligent in failing to reduce the speed limit in the construction zone, keep an accident log, and investigate accidents that occurred in the construction zone, as required by the traffic control plan. Ball was responsible for traffic control in the construction zone, a responsibility it carried out in part through supervision and implementation of the traffic control plan. Nonetheless, although the traffic control plan called for a 50 m.p.h. speed limit through the construction zone, the speed limit remained at 65 m.p.h. Similarly, although the plan required Ball to include accident information in its project log, Ball failed to investigate the two accidents that occurred in the construction zone prior to the Trujillos' accident. These alleged acts of negligence, if proven, constitute negligent performance of Ball's duties under its contract with UDOT. Ball obviously cannot avail itself of the defense that it is not liable because it merely followed the plans and specifications provided by UDOT if in fact it failed to comply with the specifications of the traffic control plan. Ball, therefore, can be held liable for its negligent noncompliance with the plan whether or not the traffic control plan itself is found to be unreasonably dangerous.

¶ 42 These are questions of fact a jury must decide. Trial courts must avoid weighing evidence and assessing credibility when ruling on motions for summary judgment. *See Dubois v. Grand Central*, 872 P.2d 1073, 1076 (Utah Ct.App.1994). Moreover, "it is peculiarly fitting that [a jury should] determine" whether the conduct of Ball comported with "'ordinary, reasonable care under the circumstances.'" *Canfield v. Albertsons, Inc.*, 841 P.2d 1224, 1227 (Utah Ct.App.1992) (quoting *DeWeese v. J.C. Penney Co.*, 5 Utah 2d 116, 121, 297 P.2d 898, 901 (1956)), *cert. denied*, 853 P.2d 897 (Utah 1993). Juries are uniquely qualified to judge whether conduct "'falls above or below the standard of reasonable conduct deemed to have been set by the community.'" *Darrington v. Wade*, 812 P.2d 452, 459 n. 4 (Utah Ct.App.1991) (citations omitted). Issues of reasonableness and negligence, therefore, should not be decided on summary judgment except when "'the applicable standard of care is "fixed by law," and reasonable minds could reach but one conclusion as to the defendant's negligence under the circumstances.'" *Id.* at 459 (citations omitted). Likewise, the issue of proximate cause is a question of fact for the jury to determine in all but the clearest cases. *See Nelson ex rel. Stuckman v. Salt Lake City*, 919 P.2d 568, 574 (Utah 1996).

### CONCLUSION

¶ 43 UDOT failed to prove, as a matter of law, that it was immune from liability to the Trujillos under the discretionary function doctrine, and questions of material fact permeate the issue of Ball's potential liability to the Trujillos. Accordingly, we reverse the summary judgment in favor of UDOT and Ball and remand to the trial court for trial or such other proceedings as may now be appropriate.

¶ 44　I CONCUR: NORMAN H. JACKSON, Judge.

¶ 45 I CONCUR IN THE RESULT: JUDITH M. BILLINGS, Judge.

