2004 UT App 284

Craig JOHNSON, Plaintiff and Appellant,

v.

DEPARTMENT OF TRANSPORTATION, Granite Construction Company of California dba Gibbons & Reed Company, and John Does I–IV, Defendants and Appellee.

No. 20030142–CA.

Court of Appeals of Utah.

Aug. 26, 2004.

Stephen P. Horvat, Anderson & Karrenberg, Salt Lake City, and Erik M. Ward and Lindy W. Vandyke, Gridley Ward & Shaw, Ogden, for Appellant.

Stephen J. Trayner and H. Scott Jacobson, Strong & Hanni, Salt Lake City, for Appellee.

Before BILLINGS, P.J., BENCH, Associate P.J., and THORNE, J.

## OPINION

BENCH, Associate Presiding Judge:

¶ 1 Craig Johnson appeals the trial court's grant of summary judgment in favor of the Utah Department of Transportation (UDOT). We reverse and remand.

## BACKGROUND [1]

¶ 2 In the early morning hours of September 14, 1996, Craig Johnson was driving southbound on Interstate 15. As Johnson traveled over a section of freeway that was undergoing maintenance, the front left tire of his vehicle entered a twelve- to eighteen-inch-deep cutout in the pavement. Johnson lost control of his vehicle, which subsequently rolled through two more cutouts of similar depth. Johnson suffered permanent injury as a result of the accident.

¶ 3 The road maintenance, joint repair, and slab replacement was performed by Granite Construction Company (Granite) pursuant to a contract it had with UDOT. Granite assumed a contractual duty to implement a traffic control plan designed by an unidentified UDOT employee. The traffic control plan channeled traffic around the work area in order to preserve the safety of motorists and maintenance workers.

¶ 4 As part of the traffic control plan, Dyke LeFevre, UDOT's Region One Director, decided Granite would use barrels to separate the construction zone from the nearest travel lane rather than the concrete barriers customarily used when cutouts deeper than six inches are required. In reaching this decision, LeFevre relied upon prior conversations with the Federal Highway Administration (FHA) concerning other projects, and brief conversations with UDOT's Deputy Director, which did not directly address whether to use barrels or barriers. Safety studies and cost-benefit reports were neither prepared nor relied upon during the decision-making process. The FHA reviewed and approved the traffic control plan.

¶ 5 In a series of meetings and correspondence, Granite and the UDOT Project Engineer assigned to the road maintenance project expressed concerns over the degree of safety provided by the barrels. They requested that the traffic control plan be modified to employ barriers rather than barrels. In response to Granite's first detailed proposal to change the traffic control plan, UDOT informed Granite that "[LeFevre] does not feel that we could get approval from the [Transportation] Commission." UDOT went on to explain that "for us to justify the proposal for a change in the traffic control plan ... the net cost of the change would have to satisfy two conditions: 1) be in the range of $450,000 or below and 2) time savings must be at least a 50 day time saving[s]." A revised proposal was submitted, to which UDOT did not respond. LeFevre testified in his deposition that he could authorize the change only if he could keep the project within budget and on time.

¶ 6 Johnson filed suit against UDOT alleging negligence in the design and implementation of the traffic control plan. Specifically, Johnson asserted that UDOT was negligent in designing the traffic control plan to use barrels rather than barriers to separate the maintenance area from traffic, and authorizing Granite to open two lanes of traffic during off-peak hours, contrary to the traffic control plan. Johnson also claimed that UDOT was negligent in permitting various other deviations from the traffic control plan on the night of his accident including placing several barrels inside the cutouts rather than between the cutouts and traffic, failing to provide a white line between the cutouts and traffic lanes, failing to keep a buffer zone of two to three feet between the striping and the barrels, and failing to replace some missing barrels.

_Utah Highway Patrol,_ 2003 UT 19, ¶ 5, 70 P.3d 72.

---

1. Because Johnson appeals from summary judgment entered against him, we recite the facts in the light most favorable to him. _See Kouris v._

¶ 7 UDOT moved for summary judgment arguing that: (1) UDOT did not have any duty to implement or monitor the traffic control plan, and (2) UDOT could not be held liable for the negligence of an independent contractor. Additionally, UDOT argued that even if it could be held liable, it would be immune from liability in this instance due to the "discretionary function" and "negligent inspection" exceptions to the Governmental Immunity Act. *See* Utah Code Ann. § 63–30–8 (1997). The trial court, adopting UDOT's reasoning, granted summary judgment in favor of UDOT. Johnson appeals.[2]

## ISSUES AND STANDARDS OF REVIEW

¶ 8 Johnson claims that the trial court incorrectly granted UDOT's motion for summary judgment by premising its grant on a number of faulty legal conclusions. Johnson argues that the contract between UDOT and Granite did not protect UDOT from liability because UDOT could not delegate its duty to provide safe highways. Johnson also maintains that UDOT may be liable even though Granite was an independent contractor. Further, Johnson contends that neither the "discretionary function" nor the "negligent inspection" exceptions to the Governmental Immunity Act shield UDOT from liability.

¶ 9 Summary judgment is proper when "there is no genuine issue as to any material fact" and "the moving party is entitled to a

judgment as a matter of law." Utah R. Civ. P. 56(c). In reviewing a grant of summary judgment, we view "the facts in a light most favorable to the losing party below." *Blue Cross & Blue Shield of Utah v. State*, 779 P.2d 634, 636 (Utah 1989). "Because the question of whether summary judgment is appropriate is a question of law, we accord no deference to the trial court." *Cannon v. Travelers Indem. Co.*, 2000 UT App 10, ¶ 14, 994 P.2d 824 (quotations and citation omitted); *see also Goodnow v. Sullivan*, 2002 UT 21, ¶ 7, 44 P.3d 704.

## ANALYSIS

¶ 10 UDOT solicited bids for the maintenance project based on specifications, provided by UDOT, including a traffic control plan. UDOT then awarded the contract to Granite. The contract provided that Granite "agrees to furnish all labor and equipment; to furnish and deliver all materials not specifically mentioned as being furnished by the Department and to do and perform all work ... for the approximate sum of [$4,998,249.00]." The contract also required Granite to "provide, erect, and maintain barriers." The project required complete removal and replacement of multiple sections of the freeway. During the project, the twelve- to eighteen-inch-deep cutouts in various lanes were to be separated from traffic according to the traffic control

2. UDOT relies heavily on the trial court's ruling dismissing the facts on the first four pages of Johnson's memorandum in opposition to summary judgment for failing to comply with rule 4–501 of the Utah Rules of Judicial Administration. *See* Utah R. Jud. Admin. 4–501(2)(B) ("The points and authorities in opposition to a motion for summary judgment shall begin with a section that contains a verbatim restatement of each of the movant's statement of facts as to which the party contends a genuine issue exists followed by a concise statement of material facts which support the party's contention."). UDOT urges us to limit the scope of our appellate review only to those facts considered by the trial court, and directs our attention to *Fennell v. Green*, 2003 UT App 291, 77 P.3d 339, for the proposition that "a trial court may exercise its discretion to require compliance with the Rules of Judicial Administration, particularly rule 4–501, without impairing a party's substantive rights." *Id.* at ¶ 9. We agree. However, Fennell's noncompliance with rule 4–501 was far more flagrant than Johnson's

alleged noncompliance. Fennell completely disregarded the movant's statement of uncontroverted facts, and "instead included only his own statement of undisputed facts." *Id.* at ¶ 7. Johnson, on the other hand, individually disputed each of UDOT's facts by number and explained why he disputed them. *See Salt Lake County v. Metro West Ready Mix, Inc.*, 2004 UT 23, ¶ 23 n. 4, 89 P.3d 155 ("[G]iven that the disputed facts were clearly provided in the body of the memorandum with applicable record references, we find the failure to comply with the technical requirements of rule 4–501(2)(B) to be harmless in this case.").

Further, the trial court premised its grant of summary judgment on the legal conclusions surrounding several of UDOT's factual concessions. Additionally, Johnson does not rely on the facts from the first four pages to dispute UDOT's facts. So even if the trial court had ordered those facts stricken, instead of just ignored for purposes of determining which facts were undisputed, Johnson's argument on appeal is unaffected.

plan. Any alterations of the traffic control plan required UDOT approval.

¶ 11 Johnson asserts that UDOT had a duty to prevent unsafe conditions during maintenance performed by an independent contractor on three grounds: (1) the nondelegable duty of UDOT to ensure highway safety, (2) the "retained control" doctrine, and (3) the "peculiar risk" or "inherently dangerous work" doctrine. UDOT counters that it had no responsibility for highway safety associated with the project since, under the terms of the contract, Granite accepted responsibility for all work, including implementation of the traffic control plan. Further, UDOT argues that because Granite was an independent contractor of UDOT, rather than its "agent, servant, or employee," UDOT cannot be held liable for the physical harm caused to Johnson, and asserts that the "retained control" doctrine is inapplicable under the present facts. UDOT also contends that the "peculiar risk" or "inherently dangerous work" doctrine has never been adopted by the Utah courts and should not be adopted here.[3]

I. UDOT's Responsibilities Under the Contract and the Delegability of UDOT's Duty to Ensure Highway Safety

■■■ ¶ 12 UDOT argues that its contract with Granite absolved it of any duty to ensure the safety of conditions associated with the project. UDOT's argument fails under both principles of contract law and nondelegability of core governmental functions. "[A] party who delegates his duties under a contract to a third person is not relieved of his responsibilities, but rather remains ultimately responsible to the party with whom he contracted for guaranteeing the successful execution of the contractual duties." *First Am. Commerce Co. v. Washington Mut. Sav. Bank*, 743 P.2d 1193, 1195 (Utah 1987). Thus, the present contract could create a new duty of care in Granite for public safety, but the creation of Granite's contractual duty did not relieve UDOT of its preexisting statutory duty to provide safe highways.

■■ ¶ 13 The Utah Supreme Court has explained that "[c]ore functions or powers of the various branches of government are clearly nondelegable under the Utah Constitution." *Salt Lake City v. Ohms*, 881 P.2d 844, 849 (Utah 1994). The inquiry focuses on whether the function or power that the branch of the government seeks to delegate involves a *core* function or power. *See id.* Examples of nondelegable functions and powers include: the supreme court's duty to discipline an erring attorney, *see In re Bridwell*, 25 Utah 2d 1, 474 P.2d 116, 116 (1970); legislative functions such as zoning and rezoning, *see Sandy City v. Salt Lake County*, 827 P.2d 212, 221 (Utah 1992); and legislative establishment of crime definitions and penalties, *see State v. Green*, 793 P.2d 912, 916 (Utah Ct.App.1990). Thus, the proper inquiry here is whether the function delegated to Granite should be considered a core governmental function. *See Ohms*, 881 P.2d at 849.

¶ 14 Utah Code section 72–1–201 creates UDOT and provides that UDOT shall:

(1) have the general responsibility for planning, research, design, construction, maintenance, security, and *safety* of state transportation systems;

. . . .

(4) plan, develop, construct, and maintain state transportation systems that are *safe*, reliable, environmentally sensitive, and serve the needs of the traveling public, commerce, and industry.

Utah Code Ann. § 72–1–201(1), (4) (2001) (emphasis added). Specifically, UDOT may "close or restrict travel on a highway under [its] jurisdiction due to construction, maintenance work, or emergency," but UDOT must "cause suitable barriers and notices to be posted and maintained" in conjunction with any such closure or restriction. Utah Code Ann. § 72–6–114 (2001). Furthermore, UDOT maintains regional offices "for the efficient carrying out of the duties of the department," and the region director is responsible for "supervising project development and operations of the state transportation systems." Utah Code Ann. § 72–1–205(1), (3)(b) (2001). Therefore, the duty to

---

**3.** Given the discussion that follows on the issues of delegability and "retained control," we need not address whether the "peculiar risk" or "inherently dangerous work" doctrine is applicable.

ensure highway safety is a core function of UDOT and is nondelegable.

¶ 15 This conclusion finds support in *McCorvey v. Utah State Department of Transportation*, 868 P.2d 41 (Utah 1993). There, the plaintiff, a motorist, was injured on a section of Interstate 15 that was being resurfaced by an independent contractor under contract with UDOT. The Utah Supreme Court ruled that "[a]lthough [the independent contractor] was responsible for the actual resurfacing on the project, UDOT supplied the traffic control plan and was ultimately responsible for motorist safety." *Id.* at 42. The court reasoned that

> [The independent contractor] was responsible for setting up the signs necessary to control traffic flow through the project. However, UDOT had an on-site inspector who had the authority to modify the plan at any time. The UDOT inspector also oversaw the progress of the actual construction project and could correct any errors occurring there.

*Id.* at 42 n. 3. Thus, even though Granite was responsible for the actual maintenance project, "UDOT supplied the traffic control plan and was ultimately responsible for motorist safety." *Id.* at 42.

## II. Granite's Status as an Independent Contractor and UDOT's Liability Under the "Retained Control" Doctrine

¶ 16 The "retained control" doctrine is an exception to the "general rule of nonliability of an employer of an independent contractor." *Thompson v. Jess*, 1999 UT 22, ¶ 14, 979 P.2d 322. The employer's duty under the "retained control" doctrine is "one of reasonable care under the circumstances" and is "confined in scope to the control asserted." *Id.* at ¶ 15. An employer who actively participates in the work of an independent contractor is subject to liability. *See id.* at ¶ 19. "[T]o have 'actively participated' in the contracted work, a principal employer must have exercised affirmative control over the method or operative detail of that work." *Id.* at ¶ 20.

¶ 17 In *Thompson*, the supreme court concluded that the employer had not actively participated in the independent contractor's

work because the employer merely exerted "control over the desired result" when she "direct[ed] that the pipe be installed over the pipe stub" and the contractor "determined the method for bringing about the desired result." *Id.* at ¶ 24. Here, there is some confusion about the distinction between methods and results as they relate to the traffic control plan. UDOT clearly specified the particular result of the contract with Granite, namely the joint repair and slab replacement on a section of Interstate 15. Although the contract did not require Granite to use any particular method for the removal and replacement of damaged sections of the highway, UDOT did specify the method for protecting the motoring public during the project. The traffic control plan can hardly be termed a *result* of the construction contract when the safety measures it provides do not endure beyond completion of the contract. Rather, the traffic control plan is the *method* through which the safety of the public is realized during the project. Moreover, Granite could not alter the method of ensuring the public's safety, the traffic control plan, without UDOT's approval. Thus, under the "retained control" doctrine UDOT may be liable for injuries caused by the traffic control plan if UDOT actively participated in that aspect of the project. The question of whether UDOT actively participated in the completion of the project therefore remains a fact question in this case. Such "issue as to [a] material fact" is not capable of being resolved on summary judgment. Utah R. Civ. P. 56(c).

## III. The Governmental Immunity Act

¶ 18 UDOT urges that, even if liability is possible under one of the previously detailed theories, the Governmental Immunity Act protects it from suit in this instance. "[The Governmental Immunity] Act renders certain negligent actions which create unsafe highways subject to liability while granting certain others immunity." *Keegan v. State*, 896 P.2d 618, 623 (Utah 1995).

### A. "Discretionary Function" Exception

¶ 19 "Discretionary function immunity . . . is designed 'to shield those govern-

mental acts and decisions impacting on large numbers of people in a myriad of unforeseen ways from individual and class legal actions, the continual threat of which would make public administration all but impossible.' " *Id.* (other quotations and citations omitted). Yet, "[n]ot every governmental action involving discretion is a discretionary function within the meaning of the Act." *Trujillo v. Utah Dep't of Transp.,* 1999 UT App 227, ¶ 21, 986 P.2d 752. Our supreme court has "distinguished between discretionary and nondiscretionary decisions on the basis of whether the decision in question involves the formulation of policy or the execution of already-formulated policies." *Keegan,* 896 P.2d at 623. "[T]he discretionary function exception 'should be confined to those decisions and acts occurring at the "basic policy-making level," and not extended to those acts and decisions taking place at the operational level ... "which concern routine, everyday matters, not requiring evaluation of broad policy factors." ' " *Id.* (citations omitted). "The reason for such a rule is plain, given the purpose of the discretionary function exception: 'Where the responsibility for basic policy decisions has been committed to one of the branches of our tri-partite system of government, the courts have refrained from sitting in judgment of the propriety of those decisions.' " *Id.* (quoting *Little v. Utah State Div. of Family Servs.,* 667 P.2d 49, 51 (Utah 1983)).

¶ 20 UDOT argues that the facts of this case are similar to *Keegan,* a decision by our supreme court, wherein the discretionary function exception shielded UDOT from liability. Johnson, on the other hand, relies upon *Trujillo,* a more recent opinion by this court, wherein we held that UDOT had not demonstrated that the discretionary function exception shielded it from liability. We believe the facts here are more similar to *Trujillo.*

¶ 21 In determining whether an act or decision is discretionary, we examine four questions. *See Keegan,* 896 P.2d at 624. First, " '[d]oes the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective?' " *Id.* (citation omitted). The decision to use

barrels rather than concrete barriers was part of a particular road maintenance project rather than being necessarily involved with a *basic* governmental *program,* such as preserving the state transportation system. If the decision involved whether or not to embark on a particular road maintenance project, for example, then the decision would necessarily involve a basic governmental program. In this instance, however, the decision to use barrels was simply an implementation detail of an already-decided project. *See Andrus v. State,* 541 P.2d 1117, 1120 (Utah 1975) ("The decision to build a highway and specifying its general location were discretionary functions, but the preparing of plans and specifications and the supervision of the manner in which the work was carried out cannot be labeled discretionary functions."). Second, " '[i]s the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective?' " *Keegan,* 896 P.2d at 624 (citation omitted). The decision to use barrels was not essential to the accomplishment of a policy or program. Changing the traffic control plan to use concrete barriers would not change the course of a policy, program, or objective; it would simply change a detail of the project. Third, " '[d]oes the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved?' " *Id.* (citation omitted). As will be discussed in greater detail below, the decision to use barrels was based primarily, if not wholly, on economic considerations, rather than policy evaluation and expertise. Fourth, " '[d]oes the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?' " *Id.* (citation omitted). UDOT has the authority to change the traffic control plan to utilize barriers rather than barrels.

¶ 22 The four questions are therefore directed to the nature of the act, omission, or decision. In ascertaining the true nature of a decision, courts have focused on

the process by which governmental entities made the decisions. *See Trujillo*, 1999 UT App 227 at ¶ 33, 986 P.2d 752. Thus, the *process* leading to a decision is indicative of the decision's *nature* since all basic policy decisions are part of a process that includes extensive analysis. However, a clearly operational decision does not become discretionary (in the sense contemplated by the exception) simply because it involves extensive studies, analysis, and discussion. *See Bigelow v. Ingersoll*, 618 P.2d 50, 53 (Utah 1980) (the discretionary function exception is "confined to those decisions and acts occurring at the basic policy making level, and not extended to those acts and decisions taking place at the operational level" (quotations and citation omitted)). UDOT's decision surrounding the use of barrels or barriers is therefore the only decision potentially involving the discretionary function exception.[4]

¶ 23 Viewing the facts in the light most favorable to Johnson, the process leading to LeFevre's decision to use barrels rather than barriers in the traffic control plan indicates that the decision was operational rather than discretionary. The parties dispute the process and discussion leading to the decision to use barrels. The process, however, involved minimal discussions between LeFevre and any UDOT or FHA official, either superior or inferior, and involved no formal safety or cost-benefit study or report. Moreover, like in *Trujillo*, the decision involved the "preparing of plans and specifications," *Andrus v. State*, 541 P.2d 1117, 1120 (Utah 1975), rather than the modifying of the existing highway as in *Keegan*. In applying the discretionary function exception in *Keegan*, our supreme court relied heavily on UDOT's comprehensive study, analysis, and department debate to conclude that UDOT's decision not to raise a median

barrier before the scheduled maintenance was protected by the discretionary function exception. *See Keegan*, 896 P.2d at 625–26. The decisions made by UDOT in that case were found to be "truly discretionary functions" since they were "the result of serious and extensive policy evaluation, judgment, and expertise in numerous areas of concern," and "inherently bound up in economic, political, and safety considerations," as evidenced by a safety study report and a cost-benefit analysis. *Id.* at 625 (quotations and citations omitted).

¶ 24 The discretionary function exception protects the government from liability for decisions that expose the government to suit regardless of the option selected by the decision-maker. *Keegan* exemplifies this type of decision: various projects unquestionably deserved funding, however, some could not be performed because of funding limitations. In such instances, the exception prevents government liability for those injuries that result from the failure to undertake projects that have not yet risen to a sufficiently high priority, as determined by the government, to merit the allocation of limited funds. Thus, the government must be granted immunity for decisions made when acting in that function so as to be able to perform that function at all. Unlike *Keegan*, LeFevre's decision did not involve prioritization of mutually exclusive projects, a process that necessarily requires weighing of basic policies. Rather, LeFevre's decision involved the performance of an assignment after the discretionary function had already been exercised. LeFevre's decision was not of the type that would expose the government to liability regardless of the option chosen. Thus, the nature of the decision indicates that LeFevre was acting in an operational function.

4. The decision to allow the lane adjacent to the cutouts to remain open at night was clearly not a discretionary function since the decision was made by a UDOT on-site inspector who acts at the operational level. *See Andrus v. State*, 541 P.2d 1117, 1120 (Utah 1975) ("[T]he supervision of the manner in which the work was carried out cannot be labeled discretionary functions."). Likewise, the failure to delineate the construction zone from the nearest travel lane with white striping, the failure to provide a buffer zone between the construction zone and the travel lanes, the placement of barrels inside the cutouts, and the missing barrels are not acts or omissions falling within the "discretionary function" exception. *See Trujillo v. Utah Dep't of Transp.*, 1999 UT App 227, ¶ 37, 986 P.2d 752 ("[E]ven if the formulation of the plan was an immune discretionary function, immunity would not extend so far as to protect UDOT from liability for negligently executing the plan.").

¶ 25 Moreover, the nature of LeFevre's position as UDOT Region One Director indicates that his position mainly involved operational decisions rather than discretionary functions involving policy evaluation, balancing, and judgment. Utah Code section 72–1–205 reads, in pertinent part:

> (1) The department shall maintain region offices ... for the efficient *carrying out* of the duties of the department.
>
> ....
>
> (3) The region director is responsible for:
>
> (a) *executing* department policy within the region;
>
> (b) *supervising* project development and operations of the state transportation systems within the region; and
>
> (c) *promoting* the department's public involvement and information programs.

Utah Code Ann. § 72–1–205 (2001) (emphasis added). In contrast, the Transportation Commission is responsible for making policy judgments and "determining priorities and funding levels of projects in the state transportation systems." Utah Code Ann. § 72–1–303(1) (2001). Even LeFevre's deposition supports this distinction: "If I could have found a way to afford [the use of barriers] and keep the cost and time factor of the project, I probably could have made that decision, but where it involved extra cost, it probably would have had to go back clear to the commission to even be considered." Le-Fevre could not have been acting in a discretionary function in this instance since he was constrained by the project budget and had no authority to alter it. Although we do not declare that UDOT Region Directors never engage in discretionary functions, the structure and duties of UDOT and the Transportation Commission suggest that UDOT Region Directors generally engage in operational functions. Thus, the nature of the decision-maker's position and the process involved in making the decision indicate that the decision to use barrels rather than barriers was an operational, nondiscretionary function.

### B. "Negligent Inspection" Exception

■ ¶ 26 The contract between UDOT and Granite required Granite to follow the traffic control plan, which included certain traffic control devices, in order to protect the project, the workers, and the public. Several deviations from the traffic control plan existed on the night of Johnson's accident: no white striping delineated the construction zone from the nearest travel lane; no buffer zone existed between the construction zone and the travel lane; the barrels were placed inside, rather than outside, of the pavement cutouts; and some barrels were missing.

■ ¶ 27 UDOT claims that the "negligent inspection" exception shields UDOT from any liability that may arise from UDOT's failure to properly inspect or monitor Granite's work. The negligent inspection exception provides "a narrow immunity for inspections to allow inspectors to perform their work without fear that an oversight which later causes injury would give rise to liability on the part of a governmental entity." *Ericksen v. Salt Lake City Corp.*, 858 P.2d 995, 998 (Utah 1993). In other words, the exception "was intended to immunize only the conclusions and results of an inspection where the inspector may have overlooked something or made a faulty judgment in deciding whether to approve or reject the subject of the inspection." *Id.* Essentially, "[t]he conclusions and results of the inspection are not to be second-guessed by courts and juries." *Id.*

■ ¶ 28 The Utah Supreme Court has indicated that "[t]he question of whether a governmental entity is liable for the negligent inspection of property most frequently arises when the entity undertakes inspections to assure compliance with building, fire, electric and other safety codes." *Id.* at 997; *see also Nixon v. Salt Lake City Corp.*, 898 P.2d 265, 270 (Utah 1995). This Court subsequently observed that both *Ericksen* and *Nixon* "stressed immunity for ... governmental inspections *of property owned by third parties* to determine whether the property complied with safety codes." *Ilott v. University of Utah*, 2000 UT App 286, ¶ 14, 12 P.3d 1011 (emphasis added). When private property is involved, the negligent inspection exception allows the government to undertake regulatory activities for the bene-

fit of the general public without the risk of liability. *See Ericksen,* 858 P.2d at 998. Here, UDOT was not engaged in a regulatory activity. Rather, UDOT inspected Granite's work for compliance with the contract to be performed on property owned by UDOT. Similar facts were present in *Ericksen.* There, a construction inspector employed by the city was inspecting a new facility at the Salt Lake City International Airport when his conduct injured one of the contractor's employees. *See id.* at 996–97. Although *Ericksen* was decided on other grounds, the Utah Supreme Court indicated in dicta that inspections of public property by the owner of that property should be treated differently from regulatory inspections of private property. *See id.* at 997.

¶ 29 Similarly, in *Ilott,* this court held that the negligent inspection exception did not protect the University of Utah from liability for injury caused by a defect in its stadium bleachers because the University was inspecting its own property, and had a specific duty to the injured party. *See Ilott,* 2000 UT App 286 at ¶¶ 14–15, 12 P.3d 1011. Although UDOT's inspections here may have been for the benefit of the general public, *Ericksen* and *Nixon* both suggest distinct treatment for inspections of private property versus inspections of property owned by the inspecting governmental entity. Thus, because UDOT was inspecting property owned by the government, the negligent inspection exception does not shield UDOT from any liability that may exist for failing to properly monitor and inspect Granite's work.

### CONCLUSION

¶ 30 For the foregoing reasons, we reverse the trial court's grant of summary judgment dismissing UDOT from the case, and remand the case for further proceedings.

¶ 31 WE CONCUR: JUDITH M. BILLINGS, Presiding Judge, and WILLIAM A. THORNE JR., Judge.