2003 UT App 272

**Albert L. SANDBERG, Plaintiff and Appellant,**

**v.**

**LEHMAN, JENSEN & DONAHUE, L.C., a Utah limited liability company, Defendant and Appellee.**

No. 20020101–CA.

Court of Appeals of Utah.

July 25, 2003.

Francis J. Carney and Stephen P. Horvat, Anderson & Karrenberg, Salt Lake City, for Appellant.

Matthew L. Lalli and Kimberly Havlik, Snell & Wilmer, Salt Lake City, for Appellee.

Before DAVIS, GREENWOOD and ORME, JJ.

## OPINION

ORME, Judge:

¶1 This case arises in the context of a legal malpractice action. Plaintiff Albert Sandberg (Sandberg) sued the law firm of Lehman, Jensen & Donahue, L.C., (Lehman) for failure to join Salt Lake City as a defendant in a personal injury action arising out of injuries Sandberg suffered when he fell into an unguarded concrete pit at the Salt Lake Valley Solid Waste Facility. The trial court granted summary judgment in favor of Lehman on the basis that Salt Lake City was entitled to governmental immunity, and thus, even if Lehman had joined Salt Lake City as a defendant, Sandberg's claim against it would have been unsuccessful as a matter of law. Sandberg appeals, and we reverse.

## BACKGROUND

¶2 Sandberg was injured when he slipped and fell into the "citizens' unloading station" at the Salt Lake Valley Solid Waste Facility (the Landfill). The Landfill is operated by the Salt Lake Valley Solid Waste Management Council (the Council), which was created in 1980 pursuant to an Interlocal Cooperation Agreement between Salt Lake City and Salt Lake County. The Council is made up of five members, including officials from the City and the County,[1] and one of its roles, according to the Interlocal Cooperation Agreement, is to "determine broad matters of policy regarding the operation and management of any solid waste processing and disposal facilities."

¶3 In the late 1980s, the Salt Lake County Public Works Department hired two consulting firms to assist it in assessing the need for a citizens' unloading station. Based on the recommendations contained in those reports, the Salt Lake County Public Works Department formally proposed that a citizens' unloading station be added to the existing facilities at the Landfill. The Salt Lake City Corporation Engineering Division was engaged to design the citizens' unloading station. Paul Jara, a civil engineer and Salt Lake City employee, was in charge of the design. The citizens' unloading station featured a central concrete pit with access roads on both sides, allowing the station's users to drive to the edge of the pit and dump their nonhazardous wastes.

¶4 On the day of his accident, Sandberg arrived at the citizens' unloading station and backed his truck up about a foot away from the curb, leaving little room on the six-foot sidewalk between the open tailgate of his pick-up truck and the edge of the pit. Sandberg then climbed into the bed of his truck and began unloading debris into the pit. While attempting to remove a two-by-four, Sandberg stepped down from the bed of his truck with one foot, slipped on the icy concrete,[2] and fell backward into the five-foot-

---

1. The Interlocal Cooperation Agreement details the composition of the five-member Council as follows:

   [O]ne member of the Board of Salt Lake County Commissioners, designated by such Board; the Mayor of Salt Lake City; one elected official designated by the Salt Lake County Council of Governments who is not a member of the government['s] party thereto; one member of the Salt Lake City/County Board of Health or the Director of Health as designated by such Board; and one member with technical expertise in the field of solid waste disposal, said expert member to be selected by a majority of the other four members.

2. The concrete was icy because it was a cold day and it had snowed the night before.

deep pit, suffering severe injuries.[3]

¶ 5 Sandberg hired Lehman to represent him in a personal injury action. Lehman sued Salt Lake County on behalf of Sandberg and received a $100,000 settlement, but Lehman did not join Salt Lake City, the designer and co-operator of the citizens' unloading station, as a defendant. The time to assert such a claim expired. Sandberg subsequently sued Lehman for malpractice, alleging that Lehman negligently failed to join Salt Lake City as a defendant in the underlying personal injury action. Lehman moved for summary judgment, arguing that designing the citizens' unloading station was a discretionary act, and thus that any claim against Salt Lake City would have been barred by the Utah Governmental Immunity Act. The trial court agreed and, after a hearing, granted Lehman's summary judgment motion. Sandberg appeals, arguing that, because Lehman failed to establish "that a conscious weighing of the pros and cons of omitting the pertinent safety features took place at the immunized policymaking level," the trial court's grant of summary judgment based on Salt Lake City's potential entitlement to governmental immunity was improper.

## STANDARD OF REVIEW

■ ¶ 6 Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). "Therefore, when we review the district court's decision to grant summary judgment, we review the court's legal decisions for correctness, giving no deference, and review 'the facts and inferences to be drawn therefrom in the light most

favorable to the nonmoving party.'" *J.R. Simplot Co. v. Sales King Int'l, Inc.,* 2000 UT 92,¶ 13, 17 P.3d 1100 (citation omitted). "As we analyze the issues, we are mindful that, 'because negligence cases often require the drawing of inferences from the facts, which is properly done by juries rather than judges, "summary judgment is appropriate in negligence cases only in the clearest instances."'" *Trujillo v. Utah Dep't of Transp.,* 1999 UT App 227,¶ 12, 986 P.2d 752 (quoting *Nelson v. Salt Lake City,* 919 P.2d 568, 571 (Utah 1996)) (other citation omitted).

## ANALYSIS

### I.   Legal Malpractice

■ ¶ 7 The Utah Supreme Court has held:

> In a legal malpractice action, a plaintiff must plead and prove (i) an attorney-client relationship; (ii) a duty of the attorney to the client arising from their relationship; (iii) a breach of that duty; (iv) a causal connection between the breach of duty and the resulting injury to the client; and (v) actual damages.

*Harline v. Barker,* 912 P.2d 433, 439 (Utah 1996). The issue in this case hinges on the fourth prong: Even if Lehman breached a duty to Sandberg in failing to join Salt Lake City as a defendant in Sandberg's personal injury claim, we must determine whether that breach was the cause of any resulting injury to Sandberg. "To prove proximate cause in legal malpractice cases . . ., the plaintiff must show that absent the attorney's negligence, the underlying suit would have been successful."[4] *Id.* Thus, Sandberg must

---

3.   Since the citizens' unloading station opened in 1991, a number of people have been injured by falling into the pit. At the time of Sandberg's injury, a six-foot sidewalk separated the driving surface from the edge of the pit, which was unguarded by barricades or chains. Soon after Sandberg's accident, the sidewalk was widened to nine feet and a chain was installed at the edge of the pit.

4.   More specifically, " '[t]he objective is to establish what the result [of the underlying litigation] *should have* been (an objective standard), not what a particular judge or jury *would have* decided (a subjective standard).' " *Harline v. Barker,*

912 P.2d 433, 440 (Utah 1996) (second alteration and emphasis in original) (citation omitted). Consistent with this principle, the parties agree that it is irrelevant that Salt Lake County, which would appear to enjoy whatever immunity Salt Lake City did, saw its way clear to settle with Sandberg for a substantial sum. We note there is at least one other case where sovereign immunity was apparently no bar to plaintiff's action against a municipality premised on a claim that the city was "negligen[t] in the construction and maintenance of the [city's] dump." *Laws v. Blanding City,* 893 P.2d 1083, 1084 (Utah Ct. App.) (noting case against city proceeded to trial

show that, if Lehman had joined Salt Lake City as a defendant in his personal injury lawsuit, that lawsuit would have been successful. Lehman argues, and the trial court agreed, that Sandberg's claim would have been unsuccessful as· a matter of law because Salt Lake City would have been entitled to immunity under the Utah Governmental Immunity Act. We therefore turn our attention to our statutory immunity scheme and the case law interpreting its provisions.

## II. Discretionary Function Immunity

¶ 8 The Utah Governmental Immunity Act (the Act) broadly grants immunity to "all governmental entities" for "any injury which results from the exercise of a governmental function." Utah Code Ann. § 63–30–3(1) (1997). The Act, however, circumscribes this broad grant of immunity by waiving immunity for certain claims. For example, as applicable to this case, the Act waives immunity for injuries "caused from a dangerous or defective condition of any public building [or] structure," *id.* § 63–30–9, and for injuries "caused by a negligent act or omission of an employee committed within the scope of employment." Utah Code Ann. § 63–30–10 (Supp.2002). Despite these waivers, immunity is nevertheless retained "if the injury arises out of, in connection with, or results from ... the exercise or performance or the failure to exercise or perform a discretionary function, whether or not the discretion is abused." *Id.* § 63–30–10(1).

¶ 9 The Utah Supreme Court has enunciated a three-pronged test to be used in determining whether a governmental entity is entitled to immunity under the Act:

(1) Was the activity undertaken by the entity a governmental function and therefore immunized from suit under the general grant of immunity contained in Utah Code Ann. § 63–30–3? (2) If the activity undertaken was a governmental function, has another section of the Act waived that blanket immunity? (3) If immunity has been waived, does the Act contain an exception to that waiver resulting in a retention of immunity against the claim asserted?

*Keegan v. State,* 896 P.2d 618, 619–20 (Utah 1995). The parties appear to agree that the design and operation of the Landfill is a governmental function and that sections 63–30–9 and 63–30–10 waive the immunity Salt Lake City would otherwise enjoy under section 63–30–3. The parties disagree, however, as to whether the discretionary function exception of section 63–30–10(1) applies to the facts of this case.

¶ 10 In *Trujillo v. Utah Department of Transportation,* 1999 UT App 227, 986 P.2d 752, a case involving facts closely analogous to the ones before us, we stated that "discretionary function immunity is 'a distinct [and] limited form of immunity [that] should be applied only when a plaintiff is challenging a governmental decision that involves a basic policy-making function.' " *Id.* at ¶ 21 (second alteration in original) (quoting *Nelson v. Salt Lake City,* 919 P.2d 568, 575 (Utah 1996)). *Accord Keegan,* 896 P.2d at 623. This is so because discretionary function immunity "is 'intended to shield [only] those governmental acts and decisions impacting on large numbers of people in a myriad of unforeseeable ways from individual and class legal actions, the continual threat of which would make public administration all but impossible.' " *Hansen v. Salt Lake County,* 794 P.2d 838, 846 (Utah 1990) (quoting *Frank v. State,* 613 P.2d 517, 520 (Utah 1980)). *Accord Trujillo,* 1999 UT App 227 at ¶ 20, 986 P.2d 752.

¶ 11 In *Trujillo* we distinguished a government entity's policy-based decisions, which are entitled to discretionary function immunity, from those acts and decisions occurring at the operational level, which are not. *See id.* at ¶¶ 21–23. The former are characterized " ' "by the high degree of discretion and judgment involved in weighing alternatives and making choices with respect to public policy and planning," ' " *Keegan,* 896 P.2d at 625 (citations omitted), while the latter " ' "concern routine, everyday matters, not requiring evaluation of broad policy factors." ' " *Id.* at 623 (quoting *Frank,* 613 P.2d at 520) (other citation omitted). *Accord Trujillo,* 1999 UT App 227 at ¶¶ 21–23, 986 P.2d 752.

on the merits), *cert. denied,* 910 P.2d 425 (Utah 1995).

¶ 12 We also noted in *Trujillo* that "[i]mmunity is an affirmative defense which the defendant bears the burden of proving." *Id.* at ¶ 27. *Accord Nelson,* 919 P.2d at 574. Thus, if a defendant "posits immunity on . . . an exercise of discretion, it must make a showing that a conscious balancing of risks and advantages took place." *Little v. Utah State Div. of Family Servs.,* 667 P.2d 49, 51 (Utah 1983). This means that a defendant "must show that each act of alleged negligence qualifies as a discretionary function under the following four-part test," *Trujillo,* 1999 UT App 227 at ¶ 27, 986 P.2d 752:

"(1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?"

*Little,* 667 P.2d at 51 (quoting *Evangelical United Brethren Church v. State,* 67 Wash.2d 246, 407 P.2d 440, 445 (1965) (en banc)).

¶ 13 Before turning our attention to the facts of the instant case, we note that application of the above test is "a fact-intensive inquiry that, by its very nature, is not particularly amenable to summary judgment." *Trujillo,* 1999 UT App 227 at ¶ 28, 986 P.2d 752. *See also Laney v. Fairview City,* 2002 UT 79, ¶ 16, 57 P.3d 1007 ("Although a party's entitlement to discretionary function immunity is a question of law, a court must have sufficient facts before it to determine whether the challenged act, omission, or decision satisfies the four-part . . . test."); *Hansen,* 794 P.2d at 846 (reversing dismissal of plaintiff's claims and remanding for further development of factual record regarding whether government decision was discretionary or operational).

### III. Analysis of Sandberg's Claims

¶ 14 Sandberg argues that Salt Lake City "was negligent in failing to have a safety chain or other [safety] barrier along the edge of the pit and in maintaining a dangerously narrow sidewalk along the pit." Lehman responds, inter alia, by arguing that the overall design of the Landfill involved policy making and, because "the pit, the sidewalk, and the absence of any chain or barrier" are safety aspects of that design, any decisions relating to those features are also matters of policy. In addition, Lehman asserts that the specific safety features at issue were considered and rejected after discussion by policy-making bodies such as the Salt Lake County Public Works Department and the Council. Thus, Lehman contends, Salt Lake City was entitled to discretionary function immunity for the claims Sandberg would have asserted against it.

¶ 15 We need not analyze Sandberg's claims under all four prongs of the *Little* test because we readily conclude that Lehman has not met its burden under the third prong. *See Little,* 667 P.2d at 51 ("To be purely discretionary, an act by the [government] must be affirmed under [all] four preliminary questions[.]"). In other words, on the record before us, and viewing "the facts and all reasonable inferences drawn therefrom in the light most favorable to [Plaintiff]," *Norman v. Arnold,* 2002 UT 81, ¶ 2, 57 P.3d 997, Lehman has not shown that the decisions leading to the omission of certain safety features at the pit were the result of "basic policy evaluation, judgment, and expertise on the part of [Salt Lake City]." *Little,* 667 P.2d at 51.

¶ 16 For example, while it is clear that the initial decision of whether to build a citizens' unloading station was considered at length at the discretionary, policy-making level, it is unclear whether the particular safety measures at issue were considered at that level. Sandberg correctly notes that "in the entire six-inch stack of reports and plans [Lehman] filed to support its summary judgment motion, there is barely a mention of whether safety chains would be installed or how wide the sidewalks would be, and there appears to

be *no* discussion of the costs and benefits of safety chains or sidewalk widths."

¶ 17 Indeed, Lehman devotes a good portion of its appellate brief detailing the steps the Council took in making the initial decision of whether "to design a new landfill with a private citizens' unloading facility." Sandberg, however, does not challenge the Council's decision to build a citizens' unloading station. Rather, Sandberg alleges that the pit that was eventually built was unsafe, and further, that the omission of certain safety features at the pit cannot be considered a discretionary function where Lehman failed to show that "the safety features at issue were ... considered at review meetings with the Public Works Department or the Council" or that "[any] decision was made by the Public Works Department or the Council to omit such features" for reasons of policy.

¶ 18 In response, Lehman relies on the affidavit of Bud Stanford, the operations manager at the Landfill. The affidavit states, in relevant part, that "[t]he Public Works Dept. and the Council conducted review meetings at various points of design and construction[, and a]t these meetings, all aspects of the design process, including whether to install additional safety features around the pit such as barriers like chains or poles were discussed and the decision was made not to install chains or poles." Later, however, when Stanford was deposed by Sandberg's counsel, the following colloquy took place:

Q. Did the landfill council have anything to do with the changes to the widening of the sidewalk and putting up the barrier in 1996? Did they have anything to do with that decision, as far as you know?
A. . . . [W]hen I made the answer to this interrogatory, we reviewed the minutes, and we couldn't find anything. So in official meetings that was probably—it probably was not discussed. We just did it on our own.
Q. All right. You testified earlier that the concept of the barrier was discussed among the engineers at some point.
. . . .
A. No, there wasn't a big discussion. . . . There were other things that were much

more important, such as the exact location, where are we going to put [the pit] on the site. The power lines that are close by, it was a big discussion. The exact dimensions of it. Groundwater ... table level was an issue. Who to hire, where are we going to get the money from to pay for it, those were the major discussions and topics. The chain—or barrier around the pit, was very minor, incidental discussions that went along with other parts of it. It was not—it was discussed, but not of any consequence.
Q. Was it ever brought up with the landfill council?
A. I believe it was in informal discussions.
. . . .
... [W]e'd discuss it, among other things ..., but it was a very minor issue. It was not a thing that we sat around and talked about like ... we're doing now. There has been more discussions on these handrails and these guardrails through this lawsuit, a thousand times more than was done at the time it was built.
Q. So there was no discussion with the landfill council about these are the benefits of ... the barriers, these are the risks of the barriers. We figure that if we put these in we will have this problem, if we don't put them in we will have this problem?
A. I don't honestly recall, but I don't think that would have happened, no.
Q. It was more of an engineering decision?
A. Uh huh (affirmative).
Q. Yes?
A. Yes. . . .
. . . .
Q. Do you know if [the Council] had any input as to whether the sidewalk was going to be nine feet as opposed to six feet?
A. [N]o. . . . We just did that on our own. The best I can recall.
Q. So you don't know of any request by the [Council] for recommendations on whether to have a barrier around the pit or not?

A. Not a formal proposal in a formal meeting that there would be minutes of, no.

Q. Do you know of anything informal?

A. I think there were discussions—informal discussions sitting around a lunchroom table type thing.

. . . .

Q. Would those discussions be the engineers, as opposed to the [Council]?

A. No, the landfill council. They would have—they like to know what's going on. They don't like to get into the minute to minute details. They leave that to us.

Q. Was this a minute to minute detail?

A. These railings are, yeah. Something they don't get involved with.

. . . .

Q. Let me just recapitulate here, make sure I understand it. The decision on installing the barrier and widening the sidewalk in late 1996, you earlier testified, was made by engineers, made by you, without the input of the council. Is that right?

A. To the best of my knowledge, that is correct. In '96, we, as management, made that decision on our own. And the impetus on that ... there were [people who] had fallen in[to the pit]—we decided that we're just going to have to bite the bullet and do this. And so we did.

¶ 19 The above exchange casts substantial doubt on Lehman's assertions that safety measures at the pit were discussed at the policy-making level, whether at the time the pit was designed and constructed or even after Sandberg's accident, when the safety features were eventually installed. Rather, Stanford's deposition suggests that safety features at the pit, for whatever reason, did not receive attention at the policy-making level but were instead delegated to employees at the operational level. In any case, the affidavit of Stanford, especially when considered in conjunction with his own deposition, is insufficient to establish as a matter of law that "a conscious balancing of risks and advantages" of particular safety measures at the pit took place at the policy-making level.

*Little v. Utah State Div. of Family Servs.,* 667 P.2d 49, 51 (Utah 1983).

¶ 20 The Utah Supreme Court's analysis in *Keegan v. State,* 896 P.2d 618 (Utah 1995), is instructive on this point. In *Keegan,* the plaintiff's husband was killed when his vehicle "skidded on black ice" on I–80, "climbed the concrete median barrier separating the eastbound and westbound lanes," and "collided with a bridge support pillar." *Id.* at 619. Plaintiff sued the State of Utah and the Utah Department of Transportation (UDOT), alleging that "they were negligent in failing to maintain the median barrier in a reasonably safe manner." *Id.* Plaintiff "asserted that although the barrier had originally been constructed in accordance with [industry] safety standards ..., two subsequent surface overlay projects had shortened the barrier below [those] standards, rendering the barrier unsafe." *Id.* In response, "UDOT and the State assert[ed] that the decision not to raise the concrete barrier during the surface overlay projects was a discretionary act shielded from liability under [the Utah Governmental Immunity Act.]" *Id.* at 623. The Court agreed.

¶ 21 In applying the four-part *Little* test, the Court noted that UDOT had commissioned and relied on two studies in making its decision not to raise the barriers. The first study, conducted by UDOT's safety studies engineer, compiled "accident rates on the ... section of I–80 where the accident occurred and other comparable stretches of road." *Id.* at 624. The safety study concluded that "not raising the barrier would not have an adverse effect on safety." *Id.*

¶ 22 The second study was conducted by a UDOT project design engineer and consisted of a cost/benefit analysis that "examined many factors[,] including the cost of removing and replacing the barrier, ... the added delays and inconvenience to users of the highway if the barrier were to be dug up and replaced, and the possibility that the job could not be completed inexpensively and with minimal disruption to traffic." *Id.* Because the above studies were "circulated throughout and debated within the department," the Court concluded that "the decision [not to raise the barriers] involved the

basic policy judgment and expertise of the agency involved" and was "just the sort of policy-driven weighing of costs and benefits that the discretionary function exception was meant to protect." *Id.*

¶ 23 Here, in contrast, Lehman has not shown that policy-driven issues such as public safety and the costs and benefits of installing safety features at the pit were considered at the policy-making level. Lehman assures us that Paul Jara, Salt Lake City employee and project engineer for the citizens' unloading station, researched "landfill designs" and "applicable industry standards," including "design features relating to safety and convenience of citizens." Even if Jara considered various safety options at the site before deciding not to include such features, it is far from clear that he was acting in a policy-making role as opposed to at the operational level, especially given the explicit reservation in the Interlocal Cooperation Agreement of policy responsibility to the Council. We faced a similar issue in *Trujillo v. Utah Department of Transportation*, 1999 UT App 227, 986 P.2d 752, and we therefore turn our attention to the facts of that case.

¶ 24 The plaintiffs in *Trujillo* were injured while traveling on I–84 when a "pick-up truck veered into their lane and collided head-on with their motor home." *Id.* at ¶ 3. At the time of the Trujillos' accident, I–84, which is "normally a four-lane, divided highway," had been reduced to two lanes to accommodate a resurfacing project. *Id.* at ¶ 4. The two lanes were separated by "only two feet," and "hollow plastic barrels spaced at 100–foot intervals divided the traffic flowing in opposite directions." *Id.* The Trujillos sued UDOT, alleging that it "negligently failed to install concrete barriers to prevent crossover accidents in the area where the Trujillos' accident took place." *Id.* at ¶ 8. "The trial court granted summary judgment in favor of [UDOT], reasoning that 'the decision made by UDOT in planning and designing the I–84 resurfacing project . . . was a discretionary act [entitled to] immunity . . . under the discretionary function exception to

the Governmental Immunity Act.' " *Id.* at ¶ 9. The Trujillos appealed, and we reversed. *See id.* at ¶ 1.

¶ 25 We noted, first, that "the traffic control plan was formulated by an unlicensed [5] UDOT staff engineer—an employee who did not perform at the policy-making level." *Id.* at ¶ 31. Further, we noted that

> while the record on appeal contains a general description of the multi-level approval process for plans and specifications pertaining to the I–84 resurfacing project, UDOT's evidence does no more than establish the traffic control plan *could* have been discussed in these meetings. UDOT does not point us to evidence that the traffic control plan and the barrels-versus-barriers decision was in fact the subject of intense scrutiny and review. UDOT now characterizes the decision to use barrels as a "tough choice" between two traffic separation methods and draws our attention to the relative risks and benefits of barrels and barriers. However, UDOT's evidence shows these issues were addressed only in private discussions between the project design engineer who drafted the traffic control plan and UDOT's Region One Design Engineer. These facts are insufficient to bring the formulation of the traffic control plan within the scope of discretionary function immunity.

*Id.* (emphasis in original). These facts substantially mirror the facts of the present case, where Lehman claims that "[a]t each stage in the design process, the City held a meeting to discuss the plans" for the citizens' unloading station, and that "[a]ll throughout the design making process these entities focused on safety analysis." Lehman, however, does not provide citations to the record that support these claims. *See J & M Constr., Inc. v. Southam*, 722 P.2d 779, 780 (Utah 1986) (per curiam) (stating that an appellate court is entitled to "adequate, competent citations to the record" to support a party's factual contentions on appeal). Although the record indicates meetings may have been held at the 40%, 70%, and 100% design stage, only minutes from the 70%

---

5. Contrary to the engineer in *Trujillo*, Jara is a licensed engineer. This distinction, however, is insufficient to transform Jara into an employee who necessarily always functions at the policy-making level.

meeting are included in the record. Those minutes include a list of attendees, none of whom are obvious policy-makers and none of whose policy-making role is explained by Lehman. Moreover, the minutes contain no mention whatsoever of safety features at the pit.[6] As we stated in *Trujillo*, evidence that safety features at the pit "*could* have been discussed in these meetings" is insufficient to establish that the decision to omit those features "was in fact the subject of intense scrutiny and review" at the policy-making level.[7] 1999 UT 227 at ¶ 31 (emphasis in original).

¶ 26 Without referencing specific page numbers, Lehman also refers us to Jara's 136–page design report, which it claims contains "research, calculations and conclusions" relating to safety features at the pit. Any such information would establish only that

Jara himself considered the inclusion of safety features at the pit; it would not establish that such matters were considered and rejected after discussion at the policy-making level.[8] According to the Interlocal Cooperation Agreement between Salt Lake City and Salt Lake County, it is the Council's role, not Jara's, to "determine broad matters of policy regarding the operation and management of any solid waste processing and disposal facilities." [9] *See id.* at ¶ 32 (noting that "while [various safety and] traffic-volume reports appear in the record, UDOT presented no ... evidence that [such] reports were discussed in the course of approving the traffic control plan").

¶ 27 At most, Lehman's evidence establishes that Jara may have discussed his decision not to install certain safety measures at the pit with Bud Stanford, manager of the

6. Although the 70% meeting minutes mention that "[g]uardrail, chain and posts are being proposed as an addition to the northwest and southwest walls perpendicular to the pit," Jara explained that these measures were being proposed as an alternative to what are now known as the "Z-walls," an area containing wheeled recycling bins and located at the exterior of the citizens' unloading station, which, in Stanford's words, echoed by Jara, "has nothing to do with the pit where people threw garbage in, where Mr. Sandberg fell in."

7. Although we had suggested otherwise in *Trujillo v. Utah Department of Transportation*, 1999 UT App 227, ¶ 31, 986 P.2d 752, in limited circumstances it may be appropriate to infer the kind of weighing and analysis at the policy-making level that occurred in *Keegan v. State*, 896 P.2d 618, 624 (Utah 1995), but not in *Trujillo. See, e.g., Laney v. Fairview City*, 2002 UT 79, ¶ 19, 57 P.3d 1007. Such an inference is not appropriate in this case where we have affirmative evidence suggesting that there was no such weighing and analysis at the policy-making level.

8. Lehman also refers in passing to portions of Jara's deposition where he states that safety measures at the pit were "brought up [with the council] in the planning stages," although he could not give "an exact date on that." At best, Jara's statements, which are inconsistent with Bud Stanford's deposition testimony, create a genuine issue of material fact as to whether safety measures at the pit were discussed at the policy-making level, thus making summary judgment inappropriate in this case. *See Harline*, 912 P.2d at 439 ("[S]ummary judgment is appropriate ... when the facts are so clear that reasonable persons could not disagree about the underlying facts[.]'").

9. In this regard, Judge Davis argues that governmental agencies will be "greatly burden[ed]" if "department employees cannot perform basic policy evaluation on behalf of agency officials." We acknowledge that, in certain circumstances, some delegation of policy-making discretion may be appropriate, so long as it is explicit. In this case, however, we have no clear showing that the Council's policy-making role was delegated to Jara, or even that Jara, realizing it had been, undertook the requisite kind of weighing and balancing of policy-based considerations required by the case law. *See, e.g., Little v. Utah State Div. of Family Servs.*, 667 P.2d 49, 51 (Utah 1983) (discussing defendant state's failure to conduct the requisite evaluations). We emphasize that discretionary function immunity, is, after all, an exception to the general rule that governmental agencies are *not* immune from lawsuits arising from injuries caused by "a dangerous or defective condition of any public building [or] structure," Utah Code Ann. § 63–30–9 (1997), or injuries caused by "a negligent act or omission of a[government] employee committed within the scope of employment." Utah Code Ann. § 63–30–10 (Supp.2002). Given this fact, together with our case law indicating that this exception should be narrowly construed, Lehman cannot avail itself of the discretionary immunity defense based on such a slender showing. *See Nelson v. Salt Lake City*, 919 P.2d 568, 575 (Utah 1996) (recognizing that "[n]early all acts performed by government employees involve some amount of discretion," but noting that "discretionary immunity clearly was not designed to cloak the ancient doctrine of sovereign immunity in modern garb" and "should be applied only when a plaintiff is challenging a governmental decision that involves a basic policy-making function").

landfill, and/or other operational employees such as staff engineers.[10] As we stated in *Trujillo,* the fact that "these issues were addressed only in private discussions between [operational-level employees is] insufficient to bring the [acts of alleged negligence] within the scope of discretionary function immunity." *Id.* at ¶ 31. *See Andrus v. State,* 541 P.2d 1117, 1120 (Utah 1975) ("The decision to build the highway and specifying its general location were discretionary functions, but the preparing of plans and specifications and the supervision of the manner in which the work was carried out cannot be labeled discretionary functions."); *Carroll v. State,* 27 Utah 2d 384, 496 P.2d 888, 891–92 (1972) (holding that "the decision of the road supervisor to use berms as the sole means of protection for the unwary traveler [from a trench resulting from road reconstruction] may properly be characterized as one at the operational level of decision making" that was not entitled to discretionary function immunity).

¶ 28 Lehman urges us to focus on "the nature of the governmental decision" at issue, i.e., Lehman argues that the safety aspects of the design of the pit are inherently policy-making functions. UDOT advanced a similar argument in *Trujillo,* contending that "decisions regarding highway median design and lane separation are inherently discretionary functions." 1999 UT App 227 at ¶ 33, 986 P.2d 752. We rejected this argument in *Trujillo,* and we reject it now. "Utah cases interpreting the discretionary function exception ... have focused on the *process* by which decisions of governmental entities are made," *id.,* not the subject-matter categories of decisions. Contrary to Judge Davis's suggestion, then, the distinction is not between decisions characterized as involving "maintenance" or "design," but between policy-based decisions and operational ones. This is not to say that the two will not sometimes coincide, but, as we stated in *Trujillo,* "we cannot assume UDOT's traffic control plan was the product of the exercise of policy-level discretion simply because it dealt with highway median design" when "UDOT proffered no evidence that the formulation of the traffic control plan and the decision to separate opposing lanes of traffic with hollow plastic barrels were ' " 'the result of serious and extensive policy evaluation, judgment, and expertise in numerous areas of concern.' " ' " *Id.* (quoting *Keegan v. State,* 896 P.2d 618, 625 (Utah 1995)) (other citations omitted).

¶ 29 Consequently, we cannot assume here that the decision to omit certain safety fea-

---

10. Lehman makes much of the fact that Salt Lake City hired EMCON, an independent consulting firm in Waste Management and Environmental Control, to review the preliminary plans for the citizens' unloading station. As Sandberg points out, however, the contract between EMCON and Salt Lake City stated that "[EMCON's] review is not a detailed design review, but rather ... a review of traffic patterns and necessary safety features for vehicles entering, unloading and then leaving the transfer station area." EMCON submitted a report to Jara after completion of its review, which, in EMCON's own words, "focused primarily on dimensions, vehicle flow, and construction details." Although the report included a recommendation to "construct vehicle wheel stops along the Z-walls," as previously noted this area "has nothing to do with the pit ... where Mr. Sandberg fell in," *see supra* note 6, and the report did not otherwise mention safety measures at the pit. Therefore, we do not consider the hiring of EMCON, nor the existence of its report, as evidence that Salt Lake City *policymakers* discussed and considered safety measures at the pit. And even if it should be so considered, it is evidence in conflict with other material evidence, and on that basis summary judgment is not proper. *See, e.g., Harline,* 912 P.2d at 438–39.

We are similarly unpersuaded by the fact that Lehman, during the course of this litigation, procured an affidavit from EMCON manager Richard Haughey in which Haughey states that "EMCON believed at the time of its report and still believes that the design of a citizen unloading facility containing a pit without barriers such as chains or poles is not inconsistent with industry practices and is a safe design." The fact that Haughey currently believes the pit is safe does not establish that such matters were singled out for discussion before the Council, especially when Haughey's conclusions were not included in EMCON's original report.

Furthermore, we note that application of discretionary function immunity does not turn on whether a decision made at the policy-making level was, in hindsight, good or bad. Rather, when it is shown that "the responsibility for basic policy decisions has been committed to one of the branches of our tri-partite system of government, the courts have refrained from sitting in judgment of the propriety of those decisions." *Little,* 667 P.2d at 51. Therefore, if Lehman had shown that the decision to omit safety features at the pit was made at the policy-making level, that decision would be entitled to discretionary immunity, even if that decision rendered the pit unsafe.

tures at the pit was the result of serious discussion at the policy-making level when Lehman has failed to show that this decision was "ever specifically singled out for discussion, review, or approval at any point in the approval process."[11] *Id.* at ¶ 5. Our cases have recognized that discretionary function immunity is "a distinct [and] limited form of immunity," *Nelson v. Salt Lake City*, 919 P.2d 568, 575 (Utah 1996), that " 'should be confined to those decisions and acts occurring at the "basic policy-making level." ' " *Keegan*, 896 P.2d at 623 (quoting *Frank v. State*, 613 P.2d 517, 520 (Utah 1980)) (other citation omitted). Such decisions and acts are " ' "characterized by the high degree of discretion and judgment involved in weighing alternatives and making choices with respect to public policy and planning." ' " *Id.* at 625 (citations omitted). *Accord Trujillo*, 1999 UT App 227 at ¶ 22, 986 P.2d 752. On the record before us, Lehman has failed to show that the decision to omit certain safety features at the pit was one involving the use of discretion and judgment at the immunized policy-making level.[12] Accordingly, we decline to extend discretionary function immunity to the facts of this case.[13] To so hold would subvert the important policies underlying this "distinct" and "limited" form of immunity.

## CONCLUSION

¶ 30 On the record before us, Lehman has failed to show that Salt Lake City would have been entitled to discretionary function immunity had it been properly joined as a defendant in the underlying lawsuit. Therefore, we reverse the trial court's grant of summary judgment in favor of Lehman and remand for trial or such other proceedings as may now be appropriate.

¶ 31 I CONCUR: PAMELA T. GREENWOOD, Judge.

DAVIS, Judge (concurring in the result):

¶ 32 Sandberg alleges that Salt Lake City was negligent in the maintenance and design of the unloading station. Because there is insufficient evidence in the record to establish that the maintenance of the unloading station was within the discretionary function exception, I concur in the result. I write separately because I disagree with the majority's conclusion that the record is insufficient to establish that the pit design approved by the Council[1] "require[d] the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved." *Little v. Utah State Div. of Family Servs.*, 667 P.2d 49, 51 (Utah 1983) (quotations and citations omitted); *see Rocky Mountain Thrift Stores, Inc. v. Salt Lake City Corp.*, 784 P.2d 459, 463 (Utah 1989) (noting design, construction, and capacity of drainage system "required the exercise of basic policy evaluation, judgment, and expertise").

---

11. Similarly, we decline to infer that the pertinent policy discussions took place merely because Salt Lake City at some point "signed off" on the project as a whole. We reject the suggestion that general approval of a project at the policy-making level is somehow equivalent to discussion and consideration of safety measures at that level. Such an expansive view would render virtually every facet of a governmental project immune to suit under the discretionary function exception.

12. We emphasize that Salt Lake City, which is not even a party to this action, is not arguing that it is entitled to discretionary function immunity. Rather, Defendant Lehman, a law firm charged with malpractice, is arguing that Salt Lake City would have had such a defense available to it had it been joined as a defendant in the underlying lawsuit. Lehman's status as something of an outsider may explain in part the difficulty it had in meeting its burden to show that discretionary function immunity applies to the facts of this case, especially on summary judgment. *See, e.g., Nelson*, 919 P.2d at 574 ("Immunity is an affirmative defense which must be proved by the defendant.").

13. Sandberg also argues that, "to the extent that the Governmental Immunity Act bars [his] claim[,] the Act violates [the Open Courts provision] of the Utah Constitution." In light of our disposition, we do not reach this issue.

1. In his affidavit, Jara attested that the plans "showed a pit with no barriers such as chains or poles." In his deposition, Stanford testified that the Council "signed off" on the plans, "so in theory they signed off to do this without a chain or railing by the pit." However, there is no evidence in the record that the sidewalk width was included in the plans.

¶ 33 The discretionary function exception requires "a showing that a conscious balancing of risks and advantages took place." *Little*, 667 P.2d at 51; *see Trujillo v. Utah Dep't of Transp.*, 1999 UT App 227, ¶ 27, 986 P.2d 752. The majority considers the alleged act of negligence in the present case to be the "omission" of barriers, a particular aspect of the design, although the Council may have approved the overall design at the policy-making level. Requiring "a conscious balancing of risks and advantages" for every conceivable negligent aspect of a design, where a design is approved at the policy-making level, could easily swallow the discretionary function exception.

¶ 34 Moreover, it will greatly burden the agency involved if, as the majority appears to maintain, under *Trujillo*, department employees cannot perform basic policy evaluation on behalf of agency officials. *See Trujillo*, 1999 UT App 227 at ¶ 31, 986 P.2d 752.[2] Other decisions indicate the exercise of basic policy evaluation, judgment, and expertise may be delegated without "intense scrutiny and review," *id.*, by agency officials. *See Duncan v. Union Pac. R.R. Co.*, 842 P.2d 832, 835 (Utah 1992) (holding "UDOT exercise[d] 'basic policy evaluation, judgment, and expertise' in utilizing a surveillance team to weigh the degree of hazard at the [railroad] crossings it inspects and to subsequently assign priorities to those crossings where the greatest hazard exists"); *Gleave v. Denver & Rio Grande W. R.R. Co.*, 749 P.2d 660, 669 (Utah Ct.App.1988) (concluding "the third *Little* question must be answered affirmatively" where "UDOT's surveillance team ... weighs ... numerous factors relating to crossing safety" "[i]n applying UDOT's safe-

ty policy"); *cf. Hansen v. Salt Lake County*, 794 P.2d 838, 846 (Utah 1990) (noting "acts implementing the policy must be considered on a case-by-case basis to determine whether they are [operational and] and ministerial and thereby outside the immunity protections" (quotations and citation omitted)).

¶ 35 In the present case, it is undisputed that the Council hired the Salt Lake City engineering department to design the unloading station. Jara, as the station designer, studied designs of other unloading stations, including their safety features, and industry standards. He recommended to the Salt Lake City engineering department that barriers not be included in the final design because they could be hazardous to individuals unloading refuse. In his deposition, Stanford, the landfill operations manager, testified that chains and poles would "hinder and cause problems for the public ... [a]nd we had a concern trying to be customer friendly ... [a]nd we thought it would hinder the public ... [a]nd that was one of our ... mandates." The Interlocal Cooperation Agreement indicates that one of the Council's duties is to "foster and promote safe and efficient solid waste disposal." It is undisputed that plans were subsequently circulated to Salt Lake City departments and other entities for comment and that the pit design was approved by the Council.[3] I would conclude that this evidence is sufficient to establish that "basic policy evaluation, judgment, and expertise" was exercised on behalf of the Council, and therefore the pit design meets the third requirement of the discretionary function exception.[4]

**2.** To the extent *Trujillo v. Utah Department of Transportation*, 1999 UT App 227, ¶ 27, 986 P.2d 752, expanded upon the law, it is not clear that it is controlling in the present case. *See Hipwell v. Sharp*, 858 P.2d 987, 989 (Utah 1993) ("It is well settled that an evaluation of the reasonableness of an attorney's services must be based on the law as it existed at the time such services were rendered, not after a subsequent legal malpractice action is filed."). The alleged act of negligence occurred when Sandberg's counsel failed to file notice of claim with Salt Lake City within a year of his injury. Sandberg's injury occurred in 1996. Thus, counsel's alleged negligence apparently occurred between 1996 and 1997. *Tru-*

*jillo* was decided in 1999. *See Trujillo*, 1999 UT App 227, 986 P.2d 752.

**3.** EMCON's report recommended that wheel stops be added.

**4.** The majority relies upon *Andrus v. State*, 541 P.2d 1117 (Utah 1975). In *Andrus*, the State created "a dangerous condition by its design of [a] highway project which allowed large quantities of rain water to accumulate," which thereafter "cascaded upon" the plaintiffs' properties. *Id.* at 1120. During the project, the State failed to take "proper steps to provide for proper and adequate drainage of the surplus water." *Id.*

¶ 36 As the majority recognizes, one purpose of the discretionary function exception is to "shield those governmental acts and decisions impacting on large numbers of people in a myriad of unforeseen ways from individual and class legal actions, the continual threat of which would make public administration all but impossible." *Keegan v. State*, 896 P.2d 618, 623 (Utah 1995) (quotations and citations omitted). Intensive scrutiny of every conceivable aspect of a design at the policy-making level is inconsistent with this policy.

¶ 37 The majority rejects Lehman's argument that the nature of the decisions involved, the safety aspects of the design, are inherently policy-making functions. Although in *Trujillo* a different panel of this court refused to consider the nature of the decision involved in concluding the discretionary function exception was inapplicable, *see Trujillo*, 1999 UT App 227 at ¶ 33, 986 P.2d 752, the majority in the present case acknowledges the nature of a decision may permit the inference that the decision involves basic policy evaluation in some instances. However, the majority fails to adequately explain why such is not the case here where the safety features of an unloading station are at issue. " 'Courts have refrained from sitting in judgment of the propriety' " of a decision " 'committed to one of the branches of our tri-partite system of government.' " *Rocky Mountain Thrift Stores, Inc.*, 784 P.2d at 464 (quoting *Little*, 667 P.2d at 51). I would conclude the safety aspects of the unloading station in the present case involve basic policy evaluation that is best left to the agency involved.

¶ 38 Accordingly, I concur in the result.

---

Unlike in the present case, the decisions in *Andrus* were not "based upon policy considerations [nor] ... designed to influence the final outcome of previous policy choices. Rather, [the deci-

sions] involved practical operational choices of how specifically to carry out some previously made policy-based decision." *Keegan v. State*, 896 P.2d 618, 625 n. 4 (Utah 1995).